JUSTICE TIMPONE delivered the opinion of the Court.
*127 **520 The New Jersey Code of Criminal Justice (the Code) contains a tolling provision that delays the start of the clock on the statute of limitations "when the prosecution is supported by physical evidence that identifies the actor by means of DNA testing ... until the State is in possession of both the physical evidence and the DNA ... evidence necessary to establish the identification of the actor by means of comparison to the physical evidence." N.J.S.A. 2C:1-6(c). These consolidated appeals hinge on the meaning of the term "actor" within that provision and require us to determine whether the provision applies when a DNA identification does not directly identify the defendant but rather begins an investigative chain that leads to the defendant. Because of the common issues in this opinion, we are consolidating these appeals.
**521 Based on the plain language of N.J.S.A. 2C:1-6(c) and the policy rationale underlying the criminal statute of limitations, we conclude that the DNA-tolling exception applies only when the State obtains DNA evidence that directly matches the defendant to physical evidence of a crime. Because the DNA identifications at issue in these cases did not directly link defendants to the relevant offenses, we affirm the Appellate Division's affirmance of the trial court's dismissal of the indictments against defendant Gary Twiggs in its entirety and against defendants James and Likisha Jones in relevant part.
A separate issue in State v. Jones is whether the indictment on the conspiracy count survives under a "continuing course of conduct" analysis that would toll the applicable statute of limitations under N.J.S.A. 2C:1-6(c). We agree that the State presented sufficient evidence of a continuing course of conduct to survive the motion to dismiss the indictment, so we also affirm the Appellate Division on that count.
I.
A.
We derive the facts in State v. Twiggs from pretrial motion practice.
On June 16, 2009, a detective from the Wildwood Crest Police Department responded to a robbery call. At the scene, *128 the detective met with S.T. (the victim) and defendant Gary Twiggs, who stated they had been robbed of their money and cell phones by a white male wearing a black hoodie, jeans, and a black mask, later identified as Dillon Tracy. S.T. told the detective that after Twiggs pulled up in his vehicle, Tracy approached S.T. from behind, placed a gun in his side, and ordered him into the passenger seat of Twiggs's vehicle. Tracy then demanded their cell phones and money and escaped into a black SUV after both Twiggs and S.T. complied. Police later found a black mask where S.T. said the black SUV had been parked. A police officer took the mask for **522 DNA analysis and later entered the extracted DNA into the Combined DNA Information System (CODIS).
Twiggs and S.T. submitted to multiple interviews with police. During one interview, S.T. admitted that he met Twiggs on the night of the robbery to sell Twiggs Percocet tablets. S.T. said he believed Twiggs and Tracy were friends and had arranged the robbery. In a later interview, Twiggs claimed he was a victim of the robbery.
In July 2014, police collected DNA from Tracy after he entered a guilty plea in drug court. His DNA matched the sample found on the mask. Tracy later confessed, implicating Twiggs in the 2009 robbery. In September 2014, based on Tracy's testimony, police arrested Twiggs for conspiracy and the robbery.
In December 2014, a Cape May Grand Jury returned an indictment, charging Twiggs and Tracy with conspiracy to commit robbery, N.J.S.A. 2C:5-2(a), and robbery, N.J.S.A. 2C:15-1(a). Twiggs moved to dismiss the indictment, arguing that the claim was barred by the general criminal statute of limitations, N.J.S.A. 2C:1-6(b)(1). The State responded that the DNA exception within N.J.S.A. 2C:1-6(c) tolled the statute of limitations.
The trial court found the DNA-tolling provision inapplicable because the DNA evidence recovered in connection with the offense did not identify Twiggs, but rather Tracy, who in turn implicated Twiggs as an alleged co-conspirator. The court consequently dismissed the indictment, and the State appealed.
A divided panel of the Appellate Division affirmed. State v. Twiggs, 445 N.J. Super. 23, 36, 135 A.3d 981 (App. Div. 2016). The majority held that "the actor" in the DNA-tolling provision "refers to the individual whose DNA is analyzed. It does not apply to a third party identified by that individual." Id. at 25-26, 135 A.3d 981. The majority determined that the plain language of the statute "only applies to persons whose DNA directly identifies them as criminal actors, and does not apply to those who are later named by those same criminal actors." Id. at 30, 135 A.3d 981.
**523 Because the physical evidence recovered and the DNA evidence later obtained did not directly, by itself, implicate Twiggs, the panel found the DNA-tolling provision inapplicable for a prosecution against him. Id. at 31, 135 A.3d 981 ("[T]he only evidence that the State derived from the DNA evidence was Tracy's identity, and, subsequently, his confession that he and defendant conspired to commit robbery.").
The majority considered the DNA-tolling exception's legislative history and rejected the State's argument that our decision in State v. Rumblin, 166 N.J. 550, 766 A.2d 1141 (2001), supports a broader definition of the term "actor." Id. at 33-34, 135 A.3d 981. The Rumblin Court concluded that the term "actor" was synonymous with "principal" and "accomplice" for purposes of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. 166 N.J. at 555-56, 766 A.2d 1141. The majority in *129 Twiggs distinguished N.J.S.A. 2C:1-6(c)'s use of the term "actor" as different "both syntactically and lexicologically" from NERA's use of the word. 445 N.J. Super. at 35, 135 A.3d 981. Focusing, therefore, on the text of the tolling provision, the panel concluded that its "syntactical use of the word 'actor' ... is more specific than the use of the term in NERA and Rumblin." Id. at 35-36, 135 A.3d 981.
According to the dissent, the "majority opinion's reasoning [cannot square] with the Supreme Court's interpretation of the term 'the actor' in State v. Rumblin." Id. at 37, 135 A.3d 981 (Leone, J., dissenting). Judge Leone's primary concern was to avoid an interpretation that "would enable the leaders of conspiracies to evade prosecution under N.J.S.A. 2C:1-6(c) by having the crime committed by minions, who alone could be prosecuted when the minion's DNA is matched." Id. at 46, 135 A.3d 981.
On May 4, 2016, the State filed a notice of appeal as of right pursuant to Rule 2:2-1(a)(2).
B.
We glean the following facts from the grand jury proceedings in State v. Jones.
**524 On August 14, 2002, ten-year-old Iyonna Jones left summer school and went to her aunt Likisha Jones's Manhattan apartment. After she arrived, Iyonna fed her nine-year-old sister, Jon-Niece Jones. Jon-Niece[1] became ill after eating and fell over. When Iyonna picked her up, Jon-Niece made Iyonna promise she would not let her die. Jon-Niece then closed her eyes, and Iyonna carried her to bed.
In the early morning hours of the next day, Iyonna's and Jon-Niece's mother, Elisha Jones, woke Iyonna and instructed her to get a large garbage bag. Elisha took the garbage bag into Jon-Niece's room while Iyonna went back to sleep. The next morning, Iyonna found a note from Elisha-intended for Likisha-explaining that Jon-Niece had stopped breathing and that Elisha went to her Staten Island home to "tak[e] care of it."
In the meantime, Likisha called her brother, James Jones, telling him that there was a family emergency and instructing him to go immediately to the Manhattan apartment.
About two days later, Iyonna overheard a phone conversation between Likisha and Elisha, during which Elisha said "she was scared and didn't know what to do" because Jon-Niece was "dead at [her] apartment ... sitting in a bucket [and] bag, along with cement and gasoline," and Elisha was contemplating "burn[ing] the apartment down." Likisha told Elisha to hold off and that help was on the way to Elisha in Staten Island.
James and Iyonna's uncle, Godfrey Gibson, traveled to Elisha's home. Likisha left the Manhattan apartment but stressed she did not accompany the men to Staten Island. Upon their arrival, Elisha packed a plastic bin and garbage bag in the rear of Gibson's car. James, Gibson, and Elisha drove to a wooded area in Upper Freehold, New Jersey. Elisha took the bin into the woods. When she returned, James recalled smelling gasoline and seeing a large fire coming from the area from which Elisha was returning.
**525 A few days later at a family meeting, everyone present made a compact to keep the incident secret and to answer any inquiries as to Jon-Niece's whereabouts with "she's with her father." Likisha denied the meeting occurred. Nearly four months later, on December 26, 2002, Elisha died, *130 leaving behind a note that took the form of an apology. It conveyed that Elisha did not want anyone to get in trouble and that when Jon-Niece got hurt she did not know what to do. Elisha ended the note by writing that "only God" can judge her.
Years later, in March 2005, a hunter found a child's skeletal remains in Upper Freehold, New Jersey. The Monmouth County Medical Examiner's Office declared the death to be a homicide based on the charred remains containing two healed rib fractures in the skeleton. The surrounding brush area was also charred. The investigation continued. The University of North Texas generated a DNA profile from the remains, but no new leads emerged. On television, "America's Most Wanted" aired a segment on the skeletal remains, dubbing it the "Baby Bones case." Still, none of the tips generated by the show revived the very cold case.
The issue was never far from the surface among the participants. In 2006, during an argument with Likisha, Iyonna threatened to "tell everyone what happened" to Jon-Niece. Likisha struck Iyonna, telling her that if she told anyone, Iyonna would also go to jail.
In 2010, some eight years after Jon-Niece's demise, Iyonna learned from James the details of the concealment of Jon-Niece's corpse: how Jon-Niece's body was placed in a bucket filled with water, gasoline, and cement and set ablaze in a dark area somewhere in New Jersey.
In July 2012, during an interview with the New York City Administration of Children's Services (Children's Services), Iyonna provided information relating to the disappearance of Jon-Niece. Iyonna recounted to Children's Services the gruesome details of the exchange she had with James about the burning of Jon-Niece's remains somewhere in New Jersey. This exchange **526 contributed to the discovery of Jon-Niece's birth certificate, social security card, and medical card, with her documentation trail ending in 2002. After her interview with Children's Services, Iyonna received a phone call from Gibson who threatened to kill her if he discovered that she talked to the police about Jon-Niece's death.
As Iyonna's information came to light, law enforcement compared Iyonna's DNA to the DNA generated from the skeletal remains. It confirmed Iyonna as a relative of the skeletal remains on the maternal side. Law enforcement also compared the skeletal DNA to the DNA of Jon-Niece's father, Jamal Kerse. It matched on the paternal side. The Medical Examiner received copies of those DNA studies in September 2012. The Medical Examiner issued a death certificate for Jon-Niece, listing the cause of death as homicidal violence including physical abuse and neglect.
In January 2013, a Monmouth County Grand Jury returned an indictment, charging James, Likisha, and Gibson with third-degree conspiracy to commit the crimes of tampering with physical evidence, obstructing the administration of law, and/or hindering the apprehension of another, N.J.S.A. 2C:5-2 ; fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1) ; fourth-degree obstructing the administration of law, N.J.S.A. 2C:29-1 ; and third-degree hindering the apprehension of another, N.J.S.A. 2C:29-3(a). The indictment separately charged Gibson with second-degree hindering the apprehension of another, N.J.S.A. 2C:29-3(a)(5) ; and second-degree hindering the apprehension of himself, N.J.S.A. 2C:29-3(b)(3).
Defendants James and Likisha moved to dismiss the indictment, arguing expiration of the applicable statute of limitations. The trial court denied the motion, ruling that the statute of limitations tolled under the *131 DNA-tolling provision, N.J.S.A. 2C:1-6(c). The court reasoned that the provision applied to the State's case against defendants because the case was "supported by" physical evidence that identified the actors-defendants-by means of DNA testing. The court held that Jon-Niece's physical remains and the DNA evidence did not need to identify defendants directly **527 as the "alleged wrongdoers" as long as it supported the prosecution, and that Iyonna's corroborating statements to police could serve as the primary evidence against defendants. The trial court reset the statute of limitations on the theory that the statute did not start to run until 2012-when law enforcement came into possession of the DNA of Iyonna and Kerse.
Defendants James and Likisha entered into conditional plea agreements, with each pleading to third-degree conspiracy to hinder apprehension and/or obstruct the administration of law, N.J.S.A. 2C:5-2, and third-degree hindering apprehension, N.J.S.A. 2C:29-3(a). The court sentenced defendants to concurrent probationary terms of two years in accordance with the plea agreements. Defendants appealed.
The Appellate Division reversed the denial of defendants' motion to dismiss the tampering, obstruction, and hindering charges; affirmed the denial of the motion to dismiss the conspiracy charge; and remanded for resentencing on the conspiracy charge. State v. Jones, 445 N.J. Super. 555, 560, 139 A.3d 1191 (App. Div. 2016).
The appellate panel highlighted the tampering, obstruction, and hindering charges as discrete offenses subject to the standard five-year statute-of-limitation period. Id. at 569-70, 139 A.3d 1191. In assessing the applicability of the DNA-tolling provision to the statute of limitations on those charges, the panel underscored the overarching inquiry as "whether the DNA evidence itself identifies the perpetrator." Id. at 566, 139 A.3d 1191 (emphasis added). Although the DNA evidence identified Jon-Niece, corroborating Iyonna's statements, the panel held that the DNA-tolling provision is inapplicable where DNA evidence is used "to identify persons other than the actor, even if the match may ultimately lead investigators to the perpetrator of the crime." Ibid.
Crucially, because the DNA results did not identify "the perpetrators whose conduct led to the child's death, or the destruction of her remains," ibid., the panel noted that "only non-DNA, purely circumstantial evidence establishes the identity of the perpetrators," id. at 567, 139 A.3d 1191. The panel observed that permitting **528 the State to circumvent general statute-of-limitation law by applying the DNA-tolling provision to individuals not directly identified through DNA "would eliminate in one stroke the protection found in the statute of limitations." Id. at 568, 139 A.3d 1191. The panel resolved that defendants' motion to dismiss the tampering, obstruction, and hindering charges should have been granted. Id. at 573-74, 139 A.3d 1191. The panel reached a different conclusion as to the conspiracy charge. Id. at 573, 139 A.3d 1191.
The appellate panel classified defendants' conspiratorial conduct as a "continuing offense" rather than a "discrete offense," thereby affirming the trial court's denial of the motion to dismiss the conspiracy charge. Id. at 568-73, 139 A.3d 1191. The panel noted that "[a] continuing offense involves conduct spanning an extended period of time and generates harm that continues uninterrupted until the course of conduct ceases." Id. at 568, 139 A.3d 1191 (quoting State v. Diorio, 216 N.J. 598, 614, 83 A.3d 831 (2014) ). The panel addressed defendants' initial conspiracy to conceal their criminal involvement in 2002 and identified overt acts taken by defendants *132 in furtherance of the conspiracy to conceal from that time through 2012. Id. at 572, 139 A.3d 1191 (indicating Likisha's 2006 threats, James's 2010 discussion with Iyonna, and Gibson's 2012 threats). Finding that defendants' continued reaffirmation of the conspiracy through the years rendered that conspiracy a "continuing offense," the panel held that the conspiracy charge was not barred by the five-year statute of limitations and did not compel dismissal of that charge. Id. at 573, 139 A.3d 1191.
We granted the State's petition for certification and defendants' cross-petitions for certification. 230 N.J. 361, 167 A.3d 651 (2017) ; 230 N.J. 374, 167 A.3d 659 (2017) ; 230 N.J. 375, 167 A.3d 659 (2017).
II.
A.
The State urges us to adopt a broad definition of "actor" under N.J.S.A. 2C:1-6(c), arguing that DNA evidence matching one **529 individual can support prosecutions of multiple defendants whose identities and involvement "[are] not known to law enforcement" until that DNA evidence is obtained. The State asserts that the definition of "actor" under N.J.S.A. 2C:1-14(g) applies to all provisions in the Code "unless a different meaning is plainly required." According to the State, N.J.S.A. 2C:1-6(c), unlike other areas of the Code, "contains no other definition of 'actor,' " and so the term must refer to "any natural person" as defined in N.J.S.A. 2C:1-14(g). Pivoting off that definition, the State argues that the statute of limitations should have been tolled because its prosecutions of defendants in each case were supported by DNA evidence that identified a natural person: the victim in Jones and the co-conspirator in Twiggs.
The State maintains that its interpretation is consistent with the legislative intent behind the exception as supported by (1) the Legislature's decision to modify its initial narrowly tailored term from "the person who commits a crime" to the broader term "the actor"; and (2) the Legislature's failure to use the term "the defendant," which would reflect Rumblin's definition for "actor." The State argues that a narrower definition "would lead to anomalous results," like foreclosing prosecution of "more culpable" parties to a crime simply because the State obtained DNA from less culpable accomplices.
Turning to the conspiracy charge in Jones, the State argues that the appellate panel correctly determined "that defendants' conspiracy was a continuing course of conduct that fell within the five year statute of limitations." The State asserts that the scope of the conspiracy was not to protect Elisha from prosecution, but rather "to conceal all the crimes committed against [the victim]" and to prevent police from ever investigating those crimes. The State distinguishes this case from that in Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), claiming that "defendants' acts of concealment were part of the charged conspiracy, not a subsidiary conspiracy to conceal after the central **530 criminal purposes of the conspiracy was attained," and highlighting four overt acts by defendants to support that argument.
Finally, the State asserts that courts at the motion-to-dismiss stage are bound to the language in the indictment to determine whether it is facially valid. Here, according to the State, the indictment's plain language "alleged a conspiracy that 'necessitates concealment' " despite its failure to allege all the overt acts in furtherance of the conspiracy. (quoting Grunewald, 353 U.S. at 405, 77 S.Ct. 963 ). The State insists that defendants' conspiracy prevented police from identifying the victim *133 and prosecuting defendants earlier. For that reason, the State submits, it would be "abhorrent" for the statute of limitations to bar defendants' conspiracy charge as defendants would "reap an unjust windfall for so thoroughly destroying Jon-Niece's body and intimidating Iyonna to prevent her from revealing the crimes."
B.
Defendants Likisha, James, and Twiggs (collectively, "defendants") rely primarily on the same arguments to assert that the term "actor" under N.J.S.A. 2C:1-6(c) refers to a criminal offender who is directly identified by DNA evidence. Likisha and James distinguish the "generally accepted definition" of actor-"one who acts"-from that of "victim"-one who "has been acted upon." In a similar vein, Twiggs argues that the statute does not explicitly include phrases that extend the exception to anyone connected to the crime.
Defendants stress that N.J.S.A. 2C:1-14(g)'s definition of actor "provide[s] the broadest possible interpretation of the word" and is not intended "to be the one and only definition of the word" in the Code. To that end, defendants maintain that the Legislature "clearly intended that the term 'actor' be synonymous with 'suspect' " for purposes of the DNA exception, as demonstrated by a Sponsors' Statement that "used the words 'suspect' and 'actor' interchangeably." Defendants emphasize the enhanced reliability of DNA evidence to identify perpetrators and the statute of **531 limitations' purpose to protect against overly stale charges based on equally stale evidence. For those reasons, defendants assert that "it makes sense" for the DNA exception to relax the statute of limitations only "for an actor whose DNA is later implicated as evidence of the crime."
Applying that definition, defendants argue that third-party statements, not the DNA obtained by the State, identified them as "suspects" in the respective crimes. Defendants urge us to reject a broader definition that will allow any person whose DNA is matched to "come forward after the statute of limitations has expired [and] unreliably identify to law enforcement [any other individuals] alleged to have been involved in the commission of a crime."
Considering the State's conspiracy charge, defendants Likisha and James argue that the central aim of their conspiracy was to protect Elisha from prosecution. Likisha and James argue that the appellate panel's decision conflicts with Grunewald because the indictment here "fails to state that the conspiracy included an express agreement" between Likisha and James to conceal the crime to avoid their own-not Elisha's-prosecution. In short, Likisha and James maintain they achieved "the central goal of the conspiracy" "[o]nce Elisha died in December 2002," and "the statute of limitations commenced to run" at that moment. According to Likisha and James, any overt acts taken afterward could not extend the life of an already extinguished conspiracy. In the alternative, Likisha and James assert that the conspiracy was abandoned because they did not commit any overt act within the five-year timeframe. Under either scenario, Likisha and James claim the statute of limitations bars prosecution for conspiracy.
III.
The question common to both appeals before us and the conspiracy question unique to Jones requires review of the dismissal of an indictment. We have stressed that a court should dismiss an indictment " 'only on the clearest and plainest ground,' and only **532 when the indictment is manifestly deficient or palpably defective." *134 State v. Hogan, 144 N.J. 216, 228-29, 676 A.2d 533 (1996) (quoting State v. Perry, 124 N.J. 128, 168, 590 A.2d 624 (1991) ).
We generally review a trial court's decision to dismiss an indictment under the deferential abuse of discretion standard. Id. at 229, 676 A.2d 533. When the decision to dismiss relies on a purely legal question, however, we review that determination de novo. See State v. Cagno, 211 N.J. 488, 505-06, 49 A.3d 388 (2012) (noting appropriateness of plenary review of dismissal of indictment as untimely under N.J.S.A 2C:1-6(b)(1) ). So, we review the questions of law presented in this case de novo and need not defer to the trial court or appellate panel's interpretations. State v. S.B., 230 N.J. 62, 67, 165 A.3d 722 (2017) (relying on State v. Grate, 220 N.J. 317, 329, 106 A.3d 466 (2015) ).
The Legislature's intent guides us in deciding the meaning of a statute. DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005). To determine the Legislature's intent, as always, we begin our analysis with the statute's plain language. S.B., 230 N.J. at 68, 165 A.3d 722 (citing DiProspero, 183 N.J. at 492, 874 A.2d 1039 ). We are bound by clearly defined statutory terms. Febbi v. Bd. of Review, Div. Emp. Sec., 35 N.J. 601, 606, 174 A.2d 481 (1961). Where a specific definition is absent, "[w]e must presume that the Legislature intended the words it chose and the plain and ordinary meaning ascribed to those words." Paff v. Galloway Township, 229 N.J. 340, 353, 162 A.3d 1046 (2017).
Statutory language is, "generally, the best indicator" of legislative intent, DiProspero, 183 N.J. at 492, 874 A.2d 1039, but our review is not limited to the words in a challenged provision. "[W]e can also draw inferences based on the statute's overall structure and composition," S.B., 230 N.J. at 68, 165 A.3d 722, and may consider "the entire legislative scheme of which [the statute] is a part," Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129, 527 A.2d 1368 (1987). After all, courts must make "every effort ... to avoid rendering any part of the statute superfluous."
**533 State in Interest of K.O., 217 N.J. 83, 91, 85 A.3d 938 (2014). "We do not view [statutory] words and phrases in isolation but rather in their proper context and in relationship to other parts of [the] statute, so that meaning can be given to the whole of [the] enactment." State v. Rangel, 213 N.J. 500, 509, 64 A.3d 558 (2013).
When the statutory language is ambiguous and "leads to more than one plausible interpretation," courts may resort to extrinsic sources, like legislative history and committee reports. DiProspero, 183 N.J. at 492-93, 874 A.2d 1039. We "may also turn to extrinsic evidence 'if a literal reading of the statute would yield an absurd result, particularly one at odds with the overall statutory scheme.' " In re N.B., 222 N.J. 87, 98-99, 117 A.3d 1196 (2015) (quoting Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572, 39 A.3d 177 (2012) ). And we must be careful not to "rewrite a statute or add language that the Legislature omitted." State v. Munafo, 222 N.J. 480, 488, 120 A.3d 170 (2015). After considering extrinsic aids, we resolve any remaining ambiguities in defendants' favor "given our strict construction of penal statutes." State v. Williams, 218 N.J. 576, 586, 95 A.3d 721 (2014) ; State v. Gelman, 195 N.J. 475, 482, 950 A.2d 879 (2008).
IV.
We begin with the question common to both appeals: whether the statute of limitations was tolled as to defendants' charges under N.J.S.A. 2C:1-6(c).
*135 A.
The public has an undeniable interest in having criminal offenders "charged, tried, and sanctioned." Diorio, 216 N.J. at 612, 83 A.3d 831. But the State's power to further that interest is not unlimited. Our law recognizes a criminal defendant's right "to a prompt prosecution," stemming from the potential prejudice likely to result "when the basic facts have become obscured by time." Ibid.
**534 Criminal statutes of limitations operate to protect defendants from that prejudice. Ibid. They are "the primary guarantee against ... overly stale criminal charges," United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), that are based on "acts in the far-distant past," Toussie v. United States, 397 U.S. 112, 114-15, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). "These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." United States v. Marion, 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) ; accord State v. Townsend, 186 N.J. 473, 487, 897 A.2d 316 (2006).
The Code includes statute-of-limitations periods for criminal offenses. N.J.S.A. 2C:1-6. The Legislature modeled N.J.S.A. 2C:1-6 after section 1.06 of the Model Penal Code. Cannel, N.J. Criminal Code Annotated, cmt. 1 on N.J.S.A. 2C:1-6 (2017). If the State does not file charges against an individual within the relevant statutory timeframe, the statute of limitations serves as "an absolute bar to the prosecution of the offense." State v. Short, 131 N.J. 47, 55, 618 A.2d 316 (1993).
Courts are bound to the statute of limitations and "cannot unilaterally nullify [its] protection." Ibid. The Legislature has lifted the bar on only a small number of "heinous" offenses that may be charged at any time. Diorio, 216 N.J. at 612-13, 83 A.3d 831 (citing N.J.S.A 2C:11-3 (murder); N.J.S.A. 2C:11-4 (manslaughter); and N.J.S.A. 2C:14-2 (sexual assault) ). The Legislature also provided an exception for cases involving DNA testing evidence. N.J.S.A. 2C:1-6(c).
As an exception to the general rules governing statutes of limitations, the DNA-tolling provision is interpreted narrowly. See, e.g., In re Expungement Application of P.A.F., 176 N.J. 218, 223, 822 A.2d 572 (2003) (noting exceptions to general rule "are to be construed narrowly"); see also Prado v. State, 186 N.J. 413, 426, 895 A.2d 1154 (2006) ("[E]xceptions in a legislative enactment are to be strictly but reasonably construed, consistent with the manifest **535 reason and purpose of the law." (quoting Serv. Armament Co. v. Hyland, 70 N.J. 550, 558-59, 362 A.2d 13 (1976) ) ).
The DNA-tolling exception that lies at the center of these consolidated appeals provides that
[a]n offense is committed either when every element occurs or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated. Time starts to run on the day after the offense is committed, except that when the prosecution is supported by physical evidence that identifies the actor by means of DNA testing ... time does not start to run until the State is in possession of both the physical evidence and the DNA ... evidence necessary to establish the identification of the actor by means of comparison to the physical evidence.
[ N.J.S.A. 2C:1-6(c) (emphasis added).]
Read narrowly, the exception tolls the statute of limitations if the State's prosecution *136 of an individual, "the actor," is "supported by" DNA evidence that matches, or "identifies," the actor to physical evidence within its possession. N.J.S.A. 2C:1-6(c). The very nature of DNA evidence makes it clear that the statute should be read that way.
The word "identifies," undefined within the statute, is commonly defined as "to establish the identity of." Merriam-Webster's Collegiate Dictionary 616 (11th ed. 2004); see also Black's Law Dictionary 813 (9th ed. 2009). "Identity," in this context, means "the distinguishing character or personality of an individual." Merriam-Webster's Collegiate Dictionary 616 (11th ed. 2004). And here, identity must be established "by means of" DNA evidence.
Aside from identical twins, DNA evidence is unique to each individual. State v. Harvey, 151 N.J. 117, 157, 699 A.2d 596 (1997) ; Passaic Cty. Bd. of Soc. Servs. ex rel. T.M. v. A.S., 442 N.J. Super. 59, 64, 120 A.3d 978 (Ch. Div. 2015) (quoting National Research Council, DNA Technology in Forensic Science 3 (1992) ). Because of its unique nature, DNA testing has become a "widespread and standard practice" in identifying criminal perpetrators. A.S., 442 N.J. Super. at 64, 120 A.3d 978. We have accepted DNA evidence as scientifically reliable and admissible in criminal trials against defendants to whom the DNA matched. See, e.g., **536 State v. Sterling, 215 N.J. 65, 102-05, 71 A.3d 786 (2013) (observing DNA evidence's " 'unparalleled accuracy' ... in linking defendants to crimes at which their DNA is found" (quoting Maryland v. King, 569 U.S. 435, 436, 451, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013) ) ); Harvey, 151 N.J. 117, 699 A.2d 596.
N.J.S.A. 2C:1-6(c) permits tolling when identification is achieved directly by DNA evidence rather than DNA evidence in addition to other means. Accordingly, it is apparent that the Legislature intended the DNA-tolling provision to apply to the sole actor whom the DNA distinctly identifies.
Although we need not resort to extrinsic sources to ascertain the Legislature's intent here, the legislative history of N.J.S.A. 2C:1-6(c) leads us to the same conclusion.
In 2002, the Senate and General Assembly amended N.J.S.A. 2C:1-6 to include the DNA exception. L. 2001, c. 308, § 1(c) (effective Jan. 3, 2002). During its drafting phase, the initial bill used the phrases "the person who commits a crime" and "the person who committed the crime" instead of "the actor." S. 1516/A. 2658 (2000). The Sponsors' Statement accompanying that draft stated: "[t]his bill would remove the time limitations on the prosecution of crimes when the person who committed the crime is unknown at the time, but DNA evidence collected at the crime scene can be used to identify the person at a later date." Sponsors' Statement to S. 1516 (Sept. 14, 2000); Sponsors' Statement to A. 2658 (June 29, 2000). The Legislature noted the purpose behind the criminal statutes of limitations is "to protect defendants from the use of 'stale' evidence against them," but pointedly distinguished "properly collected[,] ... handled and stored" DNA evidence because it "can reliably identify defendants many years after a crime has been committed." Ibid.
The final-adopted bill's Sponsors' Statement provides that the DNA exception "would toll the applicable statute of limitations for the commission of a crime in certain cases until the State is in possession of DNA evidence taken from the suspect." Sponsors' Statement to S. 1516 (Jan. 3, 2002) (emphasis added). In the final **537 bill's legislative fiscal analysis, the Legislature further explained: "[p]resently, certain guilty persons may avoid standing trial in cases where DNA ... evidence is *137 received that would establish their identities after the statute of limitations for a particular crime has expired." Legis. Fiscal Estimate to S. 1516 (Jan. 22, 2002) (emphasis added).
The Legislature's persistent use of words and phrases like "persons who committed the crime," "suspect," and "guilty persons" is evidence that it intended for the word "actor" to mean "defendant." Nothing in the legislative history of the tolling statute calls into question the plain-language reading identified above or suggests that "actor" should be construed according to the expansive definition proposed by the State.
The State urges a broader reading of the term "actor" in keeping with the definition set forth in N.J.S.A. 2C:1-14(g). We reject the State's argument that the statutory definition for "actor" is unambiguous in the Code. N.J.S.A. 2C:1-14 is a "general definitions" section that lists key words that appear throughout the Code. The statute includes two subsections that offer potentially relevant guidance as to the term "actor": subsection (e) (" 'Actor' includes, where relevant, a person guilty of an omission"), and subsection (g) (" 'Person,' 'he,' and 'actor' include any natural person and, where relevant, a corporation or an unincorporated association").
Neither of those definitions, however, is automatically binding. Rather, N.J.S.A. 2C:1-14 begins with the disclaimer that its subsections apply throughout the Code "unless a different meaning plainly is required," in which case that plainly required meaning controls.
The clearest way for a different meaning to be plainly required is, of course, for a statute specifically to define one of the terms that appear in N.J.S.A. 2C:1-14. For example, N.J.S.A. 2C:14-1, relating to sexual offenses, defines "actor" as "a person accused of an offense proscribed under this act." Because Section 14-1 attaches its own meaning to the word "actor," neither definition of **538 that word in N.J.S.A. 2C:1-14 applies to sexual offense charges. See N.J.S.A. 2C:1-14.
It is not necessary for a statute to specifically define a term from N.J.S.A. 2C:1-14 for that statute to plainly require a different meaning in a particular context. In Rumblin, for example, we declined to ascribe either statutory definition listed in N.J.S.A. 2C:1-14 to the word "actor" for purposes of NERA, despite NERA's failure to define the term itself. 166 N.J. at 556, 766 A.2d 1141. We observed that the Code "uses the word 'actor' in at least eighty-seven subsections and in at least seventy additional subparts." Id. at 555, 766 A.2d 1141 ; see also id. at 555, 766 A.2d 1141 n.1 (listing those Code provisions that use "actor"). After reviewing the statutory definitions and "viewing the term in its proper syntax," we concluded that the word "actor" is synonymous with "defendant" in NERA and includes both principals and accomplices. Ibid.
Just as we found that NERA, by its own use of the term, compelled a particular definition of "actor," so we find that the tolling statute uses "actor" to denote the defendant, the object of prosecution. Indeed, we find that adopting the State's interpretation and applying the "any natural person" language set forth in N.J.S.A. 2C:1-14(g) would undermine the purpose and policy goals of the criminal statutes of limitations.
Under the State's expansive reading, "actor" in the tolling statute could be read to mean "victim"-in Jones, for example, the identified DNA was that of Jon-Niece. But such a reading conflicts with the ordinary definition of the terms "actor" and "victim." Black's Law Dictionary defines the word "actor" as "[o]ne who acts; a *138 person whose conduct is in question," Black's Law Dictionary 40 (9th ed. 2009), and the word "victim" as "[a] person harmed by a crime, tort or other wrong," id. at 1703. Clearly, those two definitions have distinct and contrasting meanings: the actor is one who acts, and the victim is one who is acted upon.
The State's position would require courts to take multiple leaps in the investigative chain to find that the tolling provision applies.
**539 Under the State's interpretation, the tolling provision would apply even when the primary evidence used to support its prosecution of a defendant is not the DNA evidence but rather a statement by a third party. In Twiggs, for example, the DNA evidence connected a co-defendant to the crime who then implicated defendant Twiggs. Such evidence is the very kind of stale evidence the criminal statutes of limitations operate to guard against. See, e.g., Jones, 445 N.J. Super. at 567, 139 A.3d 1191 ("Unlike when a perpetrator is identified by DNA evidence, a prosecution based solely on the word of another who is identified by DNA raises the precise jeopardy the statute is intended to avoid: the difficulties in mounting a defense 'when the basic facts have become obscured by time.' " (quoting Diorio, 216 N.J. at 612, 83 A.3d 831 ) ).
The statute of limitations is not intended to assist the State in its investigations; it is intended to protect a defendant's ability to sustain his or her defense. Outside of the limitations period, a defendant faces a diminished ability to find alibi witnesses and evidence to defend against "basic facts [that] have become obscured by time." Diorio, 216 N.J. at 612, 83 A.3d 831 ; see Marion, 404 U.S. at 322, 92 S.Ct. 455. Unlike other forms of evidence, DNA evidence can never become stale. DNA evidence has proven to be a reliable source of evidence linking a perpetrator to a crime. See Sterling, 215 N.J. at 102-03, 71 A.3d 786. It logically flows that the DNA-tolling provision only tolls the statute of limitations when the State is in possession of the defendant's DNA.
We conclude that, for the DNA-tolling provision to apply, the State must have DNA evidence that establishes a direct link between physical evidence already within its possession and the defendant it seeks to prosecute.
B.
1.
We now apply our analysis to the facts of these cases. In Jones, police obtained a DNA profile from skeletal remains that **540 were unidentified until 2012. That year, based on Iyonna's statements identifying Likisha and James as participants in her sister's disappearance, police obtained and tested DNA samples from Iyonna and Kerse. Comparing Iyonna's and Kerse's DNA to the then-unidentified DNA profile, police established familial links with Jon-Niece's remains. None of defendants' DNA was found on the remains. With Iyonna's corroborating statements and the familial link between and among the DNA profiles, a grand jury in 2013 returned an indictment charging defendants with substantive and conspiratorial offenses long after the expiration of the five-year statute of limitations.
The State attempts to salvage its case by applying the DNA-tolling exception through the uncovering of the victim Jon-Niece's DNA from her remains and its indirect link to defendants. That is, according to the State, the DNA-tolling provision should apply because the State did not possess any link to Jon-Niece's remains until 2012 when it acquired Iyonna's and Kerse's DNA.
*139 As explained above, the DNA-tolling exception tolls the statute of limitations only when the State possesses DNA extracted from physical evidence that directly identifies the defendant. The DNA evidence obtained from the physical evidence in Jones-the remains-established no link beyond a familial connection to Iyonna and Kerse. That evidence certainly did not directly implicate defendants as perpetrators of the substantive crimes charged. The implication came only through third-party testimony, which N.J.S.A. 2C:1-6(c) does not operate to preserve.
We find the DNA-tolling exception inapplicable to the State's substantive charges against Likisha and James. Without the exception, the statute of limitations expired, and the indictment as to those charges should have been dismissed.
2.
In Twiggs, a grand jury indicted Twiggs based primarily on Tracy's confession and his subsequent implication of Twiggs as a co-conspirator in the armed robbery. The DNA extracted from **541 the physical evidence-the hair from the mask-identified Tracy, who, in turn, identified Twiggs.
The State contends that although the DNA evidence did not directly identify Twiggs, it began an investigative chain that later assisted in identifying him. The State suggests that the five-year statute of limitations for armed robbery tolled until the State possessed Tracy's matching DNA sample, taken after his admission into drug court. Twiggs counters that the DNA-tolling provision is inapplicable because the DNA did not directly identify him-Tracy did.
In the same way that DNA evidence in Jones is insufficient to identify the alleged wrongdoer and trigger the DNA-tolling provision, DNA evidence of a co-defendant is likewise insufficient. There exists no direct link between the DNA extracted from the physical evidence and Twiggs. The State's case against Twiggs is based primarily on Tracy's statements implicating Twiggs and other circumstantial proof. Tracy's statements in Twiggs are no different than Iyonna's statements in Jones. Such statements are exactly the type of stale evidence the statute of limitations is designed to guard against. Diorio, 216 N.J. at 612, 83 A.3d 831. So, unless DNA evidence establishes a direct identification to the defendant charged, the mere existence of DNA evidence in a case cannot work to toll general statutes of limitations.
The State argues that our reading of the term "defendant" to include principals and accomplices for NERA purposes in Rumblin should apply to the DNA-tolling context. We decline to adopt a similarly expansive reading under N.J.S.A. 2C:1-6(c). Rumblin's NERA-sentencing analysis is inapplicable to the DNA-tolling statute.
NERA uses the term "actor" in a wholly distinct framework to achieve underlying policy goals separate from those of the DNA-tolling provision. As the Appellate Division in State v. Rumblin observed, it is apparent that "actor" includes both principals and accomplices in the NERA context because "the Legislature would not have intended that the mastermind of an armed robbery could **542 avoid the consequences of [NERA] sentencing by having a confederate carry out the crime." 326 N.J. Super. 296, 302, 741 A.2d 138 (App. Div. 1999). Within NERA, an "actor" plainly encompasses both principals and accomplices as both are co-defendants, and a co-defendant cannot escape sentencing liability simply by operating as an accomplice. See, e.g., State v. Roach, 146 N.J. 208, 223, 680 A.2d 634 (1996) (noting defendant may be found guilty whether principal, accomplice, or co-conspirator). *140 For NERA purposes, then, "actor" includes accomplices because any narrower reading would undercut the State's ability to sentence equally culpable defendants.
NERA's use of "actor" peacefully coexists with statutes of limitations because it is not triggered until the sentencing phase of criminal proceedings, at the back end of the judicial process. For NERA purposes, the State has already initiated criminal proceedings within the applicable statute of limitations. NERA is not influenced by stale-evidence concerns because it is triggered only after a defendant's trial or guilty plea.
In contrast, the DNA-tolling provision creates an exception at the front end of the judicial process by permitting criminal prosecutions outside of the generally prescribed statute of limitations. N.J.S.A. 2C:1-6(c). Public policy supports such belated prosecutions because the reliability of the DNA connection to a specific individual has led the Legislature to decide that the general statute of limitations must give way.
The hallmark of a statute of limitations is that it avoids unfairly forcing a criminally accused individual to defend against stale evidence. See Diorio, 216 N.J. at 612, 83 A.3d 831. DNA evidence works to implicate a single individual. After that, all the usual issues of stale evidence resurface when the DNA-identified individual begins implicating others.
For that reason, this Court's discussion of "actor" in Rumblin to include principals and accomplices under NERA is simply inapplicable to the DNA-tolling provision.
**543 In Twiggs, the DNA-tolling exception does not apply. The State's DNA evidence only tangentially connected Twiggs to the charged crime; its primary evidence against Twiggs was Tracy's testimony. The statute of limitations tolled only against Tracy and expired on Twiggs's charges. We find that the trial court correctly dismissed the indictment in Twiggs.
V.
We now consider whether the Appellate Division properly affirmed the trial court's denial of defendants James's and Likisha's motions to dismiss the conspiracy count of the indictment in Jones.
A.
A defendant "is guilty of conspiracy ... to commit a crime if with the purpose of promoting or facilitating its commission" he or she "[a]grees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime." N.J.S.A. 2C:5-2(a)(1). "Conspiracy is a continuing course of conduct" that terminates, for statute of limitations purposes, when (1) "the crime or crimes which are its object are committed," or (2) "the agreement that they be committed is abandoned by the defendant and by those with whom he conspired." N.J.S.A. 2C:5-2(f)(1). To convict a defendant of "conspiracy to commit a crime other than a crime of the first or second degree," "an overt act in pursuance of such conspiracy" must be proven "to have been done by him or by a person with whom he conspired." N.J.S.A. 2C:5-2(d). The State is not confined to overt acts alleged in the indictment and may later prove additional overt acts. State v. LeFurge, 101 N.J. 404, 412-13, 502 A.2d 35 (1986) (discussing how the Code "did not adopt the [Model Penal Code's] requirement that the overt act be alleged in the indictment").
In Grunewald, the United States Supreme Court concluded that prosecutors *141 cannot "extend the life of a conspiracy indefinitely" by inferring a conspiracy to conceal "from mere overt acts of concealment." **544 353 U.S. at 402, 77 S.Ct. 963. Specifically, the Supreme Court held that
after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.
[ Id. at 401-02, 77 S.Ct. 963.]
The Supreme Court stressed a "vital distinction" "between acts of concealment done in furtherance of the main criminal objectives of the conspiracy," which extend the conspiracy and toll the statute of limitations, and "acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." Id. at 405, 77 S.Ct. 963. In Grunewald, the Supreme Court ultimately reversed the defendants' convictions for conspiracy to defraud the United States because the Government failed to "show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." Id. at 404, 424, 77 S.Ct. 963.
B.
On a motion to dismiss a criminal indictment, a court "view[s] the evidence and the rational inferences drawn from that evidence in the light most favorable to the State." State v. Saavedra, 222 N.J. 39, 56-57, 117 A.3d 1169 (2015). A criminal indictment is proper if the State presented the grand jury with at least " 'some evidence' as to each element of a prima facie case." State v. Bennett, 194 N.J. Super. 231, 234, 476 A.2d 833 (App. Div. 1984) (quoting State v. Donovan, 129 N.J.L. 478, 483, 30 A.2d 421 (1943) ). A trial court's denial of a motion to dismiss an indictment is reviewed for abuse of discretion. Saavedra, 222 N.J. at 55, 117 A.3d 1169 (citing State v. Hogan, 144 N.J. 216, 229, 676 A.2d 533 (1996) ).
Viewing the facts in a light most favorable to the State, we find the State presented sufficient evidence to survive defendants James's and Likisha's motions to dismiss their indictments'
**545 conspiracy counts. The co-conspirators here exhibited a continuing course of conduct beginning well before and extending far beyond Elisha's death in 2002. Their acts allegedly included (1) the family meeting in 2002 at which all entered into a compact to keep the incidents leading to Jon-Niece's death a secret and to lie about her whereabouts with no apparent dissent; (2) Likisha's threatening of Iyonna in 2006 when Iyonna considered imperiling the conspiracy by exposing it; (3) James's explicit discussion with Iyonna in 2010 concerning the details of the burning of Jon-Niece's body; and (4) Gibson's threat in 2012 to kill Iyonna if he were to discover that she disclosed the conspiracy to the police. The potential exists that those actions were not merely intended to protect Elisha from prosecution, as they postdated her death, but also to insulate from discovery the co-conspirators' roles in hindering and in the destruction of evidence.
Their corresponding actions, the early stages of the proceedings, and the low evidentiary bar necessary to overcome defendants' motion, combine to provide sufficient evidence of a continuing course of conduct for the State to survive defendants' motion to dismiss the indictment.
Whether at trial or at further hearings, defendants are entitled to challenge the evidence advanced by the State. And, if *142 this case proceeds to trial, defendants would be entitled to a jury charge explaining Grunewald's application.
Finally, the State's concession before the trial court that the "continuing course of conduct" exception to the statute of limitations was inapplicable is not binding on our analysis. State v. Josey, 290 N.J. Super. 17, 32, 674 A.2d 996 (App. Div. 1996) ("[A] position by the prosecutor favorable to a defendant should be given great weight but is not binding on a court." (discussing Young v. United States, 315 U.S. 257, 258, 62 S.Ct. 510, 86 L.Ed. 832 (1942) ) ). We find that there may have been a continuing course of conduct, for tolling purposes, which will be determined by a jury upon remand.
**546 VI.
We affirm the judgment of the Appellate Division affirming the trial court's dismissal of the indictment against defendant in Twiggs.
We also affirm the judgment of the Appellate Division in Jones, reversing the trial court's denial of defendants' motion to dismiss the indictment on the substantive tampering, obstruction, and hindering charges and affirming the denial of defendants' motion to dismiss the indictment on the conspiracy charge.
The cases are remanded to the respective trial courts for proceedings consistent with this opinion.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion.

We refer to members of the Jones family by their first names for the sake of clarity.