# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1249-23

IN THE MATTER OF THE
SEIZURE OF CERTAIN
WEAPONS BELONGING
TO M.G.

_____

Submitted May 12, 2025 – Decided June 19, 2025

Before Judges Berdote Byrne and Jablonski.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FO-18-0269-23.

Evan F. Nappen Attorney at Law, PC, attorney for petitioner M.G. (Louis P. Nappen, on the brief).

John P. McDonald, Somerset County Prosecutor, attorney for respondent State of New Jersey (Christopher R. Lyons, Assistant Prosecutor, on the brief).

PER CURIAM

M.G.[1] appeals a Family Part order granting the State's request to forfeit his firearms and to revoke his firearms purchaser identification card ("FPIC"), and finding that M.G.'s possession of both would jeopardize the "public health, safety[,] or welfare."  Deferring to the trial court's factfinding and credibility assessments, we affirm.

I.

The facts are taken from the two-day forfeiture hearing before the Family Part.  M.G. and K.H.G. were engaged in a domestic violence dispute that led K.H.G. to obtain a temporary restraining order ("TRO").  When the police served the TRO upon M.G., they seized two handguns, a shotgun, and ammunition, and also confiscated his FPIC.

Shortly thereafter, the State petitioned the Family Part to forfeit M.G.'s firearms and to revoke his FPIC.  The State asked K.H.G. whether she believed that M.G.'s continued firearms possession might endanger herself or others.  In response, she explained her belief that returning M.G.'s weapons would, indeed, pose a significant danger.  She referenced M.G.'s compilation of a "hit list" containing seven individuals he claimed he would "carry out" if he were sick or dying.  K.H.G. also detailed that "[M.G.] spoke of riding his

[1]  We use the parties' initials to protect their confidentiality.  R. 1:38-3(d)(10).

motorcycle, being off the grid, following these people around for several days to learn their routine and then making it look like an accident or [drive-by] shooting."

As this litigation proceeded, concurrently, M.G. and K.H.G. agreed to civil restraints and executed a consent order to memorialize that agreement. The order, as read by the trial court in its oral decision, made specific reference to M.G.'s weapons:

> [M.G.]'s weapons were seized in connection with a TRO. As part of this consent order [M.G.] has agreed not to seek the return of his firearms or [FPIC] until such time as a final judgment of divorce is entered or a period of [eighteen] months has passed from the date of the TRO, whichever is later in time.
>
> At such time, assuming no further acts of domestic violence have occurred, [K.H.G.] will not oppose the return of [M.G.]'s firearms and [FPIC] and property from the [c]ounty [p]rosecutor. [M.G.] will provide a psychological evaluation to the [c]ourt in the course of his application to return his weapons.

After the consent order was signed, K.H.G. voluntarily dismissed her TRO. The State's forfeiture application remained in place.

Three witnesses testified at the hearing in the Family Part. The first was Sergeant Everett Holt who served M.G. with the TRO and later seized M.G.'s firearms, ammunition, and FPIC. He reported that when he responded to the

3

domestic violence incident, K.H.G. informed him that M.G. owned firearms and had compiled a "hit list" M.G. would carry out if he were sick or dying.

K.H.G. testified that M.G. placed firearms on the table in front of her on several occasions. She felt intimidated by these actions and construed them as threats that M.G. intended either to hurt her or to kill himself. According to K.H.G, M.G. would often threaten to commit suicide and would put a gun to his head if he ever spent too much time by himself.

Like Sgt. Holt, K.H.G. was also aware of M.G.'s "hit list" and provided additional personal details that M.G. made several menacing remarks about each of the people on that list. K.H.G. acknowledged, however, that she never saw any written list and also admitted that M.G. never took any action against those people on it. K.H.G. also specifically noted an incident during which M.G. was either holding a gun to his head or waving a gun around his head in their garage, causing her to believe M.G. either would harm her or himself. She fled the house and did not return until M.G. called her and assured her that it was safe to return home.

Regarding M.G.'s temper, K.H.G. testified that M.G. had issues controlling his anger. She described that he would throw things when frustrated or annoyed and that she was "frequently in the line of fire and

almost got hit multiple times."  K.H.G. also described more generally that M.G. would often yell at her.

M.G. testified on his own behalf.  He denied having a "hit list", but a "sh** list" that he created as a joke.  He explained that he would add people to that list if they "did [him] wrong."  M.G. stated he never threatened K.H.G. with any firearms.  According to M.G., he only displayed them to her when they began dating and once when he used one to kill an intrusive gopher. M.G. commented on his own mental health and told the court he was not depressed nor did he contemplate suicide.  He referred to a psychiatric evaluation that concluded that he was not "an unusual risk or danger to himself, any other individual, or to society at large should his weapons be returned to him."  That evaluation also noted that M.G. reported harboring no animosity toward the people on his "hit list."

In an oral decision, the trial court assessed the credibility of the witnesses and highlighted, in particular, the inconsistencies in M.G.'s trial testimony.  Consequently, the court granted the State's application and held that it proved by a preponderance of the evidence that M.G.'s firearms should be forfeited and his FPIC revoked because M.G.'s "possession of . . . firearms

A-1249-23

is not in the interest of public health, safety[,] or welfare." N.J.S.A. 2C:25-21d(3).

M.G. appealed.

II.

A.

Because of the fact-sensitive nature of firearms forfeiture and FPIC revocation applications, we defer to the court's factfinding and credibility assessments. See In re M.U.'s Application for a Handgun Purchase Permit, 475 N.J. Super. 148, 199 (App. Div. 2023); In re Forfeiture of Pers. Weapons and Firearms Identification Card Belonging to F.M., 225 N.J. 487, 505-06 (2016) "Heightened deference should be given to the trial court's assessment of witness credibility because the court was able to observe the witnesses as they testified." M.U., 475 N.J. Super. at 171. Accordingly, we will not disturb the trial court's factual findings and legal conclusions "unless [we are] convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015)); see also In re Return of Weapons to J.W.D., 149 N.J. 108, 116 (1997) ("Ordinarily, an appellate court should accept a trial

court's findings of fact that are supported by substantial credible evidence."). Questions of law, however, are reviewed de novo and "[t]he legal determinations of the Family Part . . . are not entitled to any special deference." F.M., 225 N.J. at 506.

B.

Our Legislature has acknowledged a citizen's right to possess firearms lawfully unless good cause exists to deprive an owner of them. In re Appeal of the Denial of R.W.T., 477 N.J. Super. 443, 460-61 (App. Div. 2023) (quoting In re Z.L., 440 N.J. Super. 351, 355 (App. Div. 2015)) (citing N.J.S.A. 2C:58-3(c)). Circumstances that might disqualify a person from firearm ownership or from FPIC licensure are listed in N.J.S.A. 2C:58-3(c)(1-15). Logistically, if law enforcement seizes weapons or confiscates an FPIC from a person involved in a domestic violence incident, the State may bring an application to forfeit both. N.J.S.A. 2C:25-21(d)(3). At a summary proceeding, if the State proves that the firearms owner or FPIC licensee is subject to any of the N.J.S.A. 2C:58-3(c) disabilities by a preponderance of the evidence, a trial court may order the forfeiture and revocation. N.J.S.A. 2C:25-21(d)(3); F.M. 225 N.J. at 508.

The purported disability at issue in this case appears at N.J.S.A. 2C:58-3(c)(5):

> A handgun purchase permit or [FPIC] shall not be issued:
>
> . . . .
>
> (5) To any person where the issuance would not be in the interest of the public health, safety[,] or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm[] . . . .
>
> [(Emphasis added).]

M.G. primarily argues the trial court's judgment should be vacated because the Family Part did not find what M.G. characterizes as an "essential element and finding" predicate to an order to forfeit weapons and to revoke his FPIC. He specifically contends that because the trial judge failed to reference that he "lacked the essential character of temperament necessary to be entrusted with a firearm," the order was legally infirm. Although we note that the trial judge did not reference these specific words set forth in N.J.S.A. 2C:58-3(c)(5) in his oral decision, a detailed review of the facts included in the trial record nevertheless supports the trial court's legal conclusion.

The concept of an "essential character of temperament necessary to be entrusted with a firearm" is not specifically defined in our jurisprudence.

A-1249-23

Therefore, to interpret this provision, we are guided by the principles of statutory interpretation. To that end, the "first step . . . is to consider the plain language of the statute." State in Interest of K.O., 217 N.J. 83, 91 (2014). In doing so,

> [w]e will "ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "If the Legislature's intent is clear from the statutory language and its context with related provisions, we apply the law as written." Shelton v. Restaurant.com, Inc., 214 N.J. 419, 429 (2013).
>
> "[O]nly when the statute is ambiguous, the plain language leads to a result inconsistent with any legitimate public policy objective, or it is at odds with the general statutory scheme," will we turn to extrinsic tools to determine legislative intent. Ibid. This [c]ourt, however, may not "rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language." O'Connell v. State, 171 N.J. 484, 488 (2002).
>
> [In re Proposed Constr. of Compressor Station (CS327), 258 N.J. 312, 324-25 (2024) (second and fourth alterations in original).]

Further, a court should not examine the challenged portion of a statute in isolation but instead must consider the entire statutory scheme. See State v. Rangel, 213 N.J. 500, 509 (2013) ("We do not view words and phrases in

isolation but rather in their proper context and in relationship to other parts of a statute, so that meaning can be given to the whole of an enactment."). However, "[w]hen the statutory language is ambiguous and 'leads to more than one plausible interpretation,' courts may resort to extrinsic sources, like legislative history and committee reports." State v. Twiggs, 233 N.J. 513, 533 (2018) (quoting DiProspero, 183 N.J. at 492-93).

Applying these principles, "character" may be defined as "[t]he traits or qualities that combine to make an individual human being distinctive from others, esp[ecially] as regards morality and behavior." Black's Law Dictionary 291 (12th ed. 2024). Temperament refers to "characteristic or habitual inclination or mode of emotional response." Merriam-Webster's Collegiate Dictionary 1285-86 (11th ed. 2020). "Character of temperament," therefore, reflects one person's individual and unique state of mind. "Essential" means "[o]f relating to, or involving the essence or intrinsic nature of something," or, "[o]f the utmost importance; basic and necessary." Black's Law Dictionary, 686 (12th ed. 2024).

Considering these definitions, and notwithstanding the lack of recitation of the specific statutory words, we find that the judge's factual findings, buttressed by his credibility assessments, support the determination that M.G.

lacked "the essential character of temperament necessary to be entrusted with a firearm." N.J.S.A. 2C:58-3(c)(5). The trial judge found that Sgt. Holt testified about M.G.'s "hit list" that M.G. would "carry out" if M.G. were sick or dying. K.H.G. provided direct testimony about that list and how he frighteningly displayed a firearm in a manner that jeopardized her safety. M.G. threatened suicide, and voiced threats about each person on the "hit list" multiple times. M.G. had told K.H.G. that if he spent too much time alone he would put a gun to his head. She testified that M.G. pointed a gun to his own head or brandished it in such a way that K.H.G. fled their house until he assured her that he would not do anything to harm himself.

The trial judge also noted substantial inconsistencies between M.G.'s testimony and his psychiatrist's report. The report describes that M.G. "insist[ed] that he knows the people mentioned on the list and that he bears no animosity towards any of them," but M.G.'s "relatively candid" testimony revealed that he believed the people on his "hit list"—which he insists he more often referred to as a "shit list"—"did [him] wrong."

These specific observations, combined with K.H.G.'s general testimony that M.G. had occasional difficulty controlling his anger, was easily frustrated and annoyed, and became "extremely upset and angry" were sufficient to

establish that M.G. did not possess the essential character of temperament to own or possess firearms.

C.

Second, M.G. alleges the trial court improperly disregarded his expert's opinion when it granted the State's forfeiture application. Specifically, M.G. argues the trial court "erred by substituting its own mental health opinion (or an ex-wife's opinion) for that of a medical expert." We disagree.

As with all expert opinions, a fact finder is free to accept or reject M.G.'s psychiatrist's opinion when deciding whether to grant the State's forfeiture application. See Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002) ("A trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety."). Here, the trial court scrutinized M.G.'s expert's psychiatric evaluation, but ultimately decided not to adopt the expert's conclusion that the return of M.G.'s weapons would not pose a public danger. Because the trial court's decision to reject the expert's conclusion was reasonably based on contradictions from M.G.'s deemed credible testimony and what he stated to the expert during his psychiatric evaluation, it did not amount to any mistaken exercise of discretion.

D.

Finally, M.G. contends the trial court's decision runs afoul of the United States Supreme Court's decisions in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022) and United States v. Rahimi, 602 U.S. 680 (2024). We are not persuaded by this argument.

We have already decided that N.J.S.A. 2C:58-3(c)(5) does not offend the Court's decision in Bruen. See M.U., 475 N.J. Super. at 194 (upon performing a detailed Bruen analysis, concluding N.J.S.A. 2C:58-3(c)(5) is constitutional because "it is . . . well-rooted in the nation's history and tradition of firearm regulation that individuals whose armament poses a risk to 'public health, safety[,] or welfare,'" are "beyond the ambit of 'the people' protected by the Second Amendment"); see also R.W.T., 477 N.J. Super. at 454 ("[W]e recently rejected a facial challenge to the constitutionality of the 'public health, safety[,] or welfare' disqualification criterion.").

However, M.G.'s argument regarding Rahimi, which was not raised at the trial level because Rahimi was decided in the interim of this appeal, arguably raises an issue of public concern permitting us to comment briefly on it. See State v. Dangcil, 248 N.J. 114, 132 n.4 (2021).

13

M.G. contends <u>Rahimi</u> permits only temporary disarmament, and specifically only for "violent felons," "the mentally insane," or those who have a "present restraining order where the court has deemed them a credible threat of physical harm to another individual." M.G. argues that he does not fall into any of these categories.[2]

We are persuaded by the State's position in opposition that M.G.'s interpretation of <u>Rahimi</u> is overly expansive. <u>Rahimi</u> did not create new law. Rather, it applied <u>Bruen</u> to 18 U.S.C. § 922(g)(8) and concluded that statute was "wholly consistent with the Nation's history and tradition of firearm regulation." <u>Rahimi</u>, 602 U.S. at 703 (Sotomayor, J., concurring). M.G.'s contention that <u>Rahimi</u> exclusively enumerated only three categories of individuals subject to disarmament is incorrect. The Court reiterated that disarmament of "felons and the mentally ill" is "presumptively lawful," <u>Rahimi</u>, 602 U.S. at 689, and concluded individuals subject to U.S.C. § 922(g)(8) with a present restraining order and who "represent[] a credible threat to the physical safety of an intimate partner" may be temporarily disarmed. <u>Rahimi</u>, 602 U.S. at 690. Although the Court concluded by stating

_____

[2] M.G. also argues the trial court offended <u>Rahimi</u> because it made its decision in part on the opinion M.G. was not a "responsible" gun owner. However, this argument is rejected because the trial court never made such a determination, nor did it factor M.G.'s level of responsibility with guns into its analysis.

"[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment," this language in no way expressed that individuals can only be disarmed temporarily. See id. at 702.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-1249-23