**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2504-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

VANCLEVE ASHLEY,

     Defendant-Appellant.

_____

Argued March 1, 2021 – Decided May 7, 2021

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 03-06-1233.

John Vincent Saykanic, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John Vincent Saykanic, on the brief).

Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Monica do Outeiro, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

In <u>State v. Ashley</u>, 443 N.J. Super. 10, 13, 16-21, 24 (App. Div. 2016), we vacated defendant Vancleve Ashley's[1] conviction that was entered after he pled guilty to one count of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) and we remanded for a new trial. After our remand, defendant filed two unsuccessful pre-trial motions, one seeking to disqualify the Monmouth County Prosecutor's Office (MCPO) under N.J.S.A. 52:17B-107(a), to disqualify the Superior Court judges sitting in Monmouth County from any involvement in his case, and to have the matter transferred under <u>Rule</u> 3:14-2 from Monmouth County to Essex County, and the other to dismiss the indictment with prejudice. He later pled guilty again to aggravated assault and was sentenced to time served.[2]

Defendant now appeals from his conviction, challenging the January 11, 2018 order denying his motion for disqualification and change of venue and the

---

[1] Defendant is now known as Qawee Ali.

[2] The sentence was made concurrent to a federal sentence defendant was serving for an unrelated offense.

October 12, 2018 denial of his motion to dismiss the indictment. On appeal,

defendant raises the following specific arguments:

> POINT I
>
> THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE AS THE MONMOUTH COUNTY PROSECUTOR'S OFFICE (MCPO) ILLEGALLY INTRUDED INTO THE ATTORNEY-CLIENT RELATIONSHIP TO SUCH AN EXTENT THAT THE ATTORNEY-CLIENT RELATIONSHIP WAS DE[S]TROYED AND DEFENDANT ASHLEY'S TRIAL STRATEGY (ALIBI AND MISTAKEN IDENTITY) WAS REVEALED; DEFENDANT ASHLEY'S SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW WERE VIOLATED UNDER BOTH THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.
>
> POINT II
>
> THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE AS THE GRAND JURY PRESENTATION WAS FUNDAMENTALLY UNFAIR AS THE GRAND JURORS HEARD FALSE, INACCURATE AND MISLEADING EVIDENCE THAT WAS PRESENTED BY THE STATE IN VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND UNDER THE NEW JERSEY CONSTITUTION.

POINT III

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE DUE TO THE EXCLUSIVE RELIANCE UPON HEARSAY AND DOUBLE HEARSAY IN THE GRAND JURY PRESENTATION IN VIOLATION OF DEFENDANT'S FIFTH AMENDMENT RIGHT TO A FAIR GRAND JURY AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND RIGHTS UNDER THE NEW JERSEY STATE CONSTITUTION.

Defendant also filed a pro se supplemental brief in which he raises the following argument:

POINT I

THE TRIAL COURT ABUSED ITS DISCRETION BY 1) DENYING THE MOTION TO RECUSE THE MONMOUTH COUNTY JUDICIARY; 2) DENYING THE MOTION TO DISQUALIFY THE MONMOUTH COUNTY PROSECUTOR'S OFFICE (MCPO); AND 3) DENYING THE MOTION FOR A CHANGE OF VENUE UNDER R. 3:14-2 AS A FAIR AND IMPARTIAL TRIAL (OR PRETRIAL HEARINGS) COULD NOT BE HAD IN MONMOUTH COUNTY IN VIOLATION OF DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL (U.S. CONST. AMEND. XIV; N.J. CONST. ART. 1, PARA. 10).

We are not persuaded by these contentions. We affirm.

4

I.

A.

The facts pertinent to defendant's motions are summarized from the record as follows. On June 21, 2002, two men using the names "Frank White" and "Big Bruce Smith" visited the law offices of Peter Paras in Red Bank. Later that same day, as he was leaving his office, Paras was struck, according to witnesses, by a blue Jeep Liberty with a license plate number MME74Z that subsequently fled the scene. Soon thereafter, the Red Bank Police Department suspected defendant was involved in the assault on Paras based upon information gathered from witnesses who stated that the vehicle "was operated by a black male driver with a black male passenger," who were later identified as the men who had been in Paras's office, and from the New Jersey Motor Vehicle Commission's records that revealed that the vehicle used to strike Paras was leased to Tina DeStefano, defendant's girlfriend.

The police spoke with Raimaine York who admitted to accompanying defendant to Paras's office as "Big Bruce Smith." According to York, defendant told him he "had to see his lawyer" because the lawyer "needed" to be "intimidate[d] . . . because he fucked up a case." York told police that once the two were in Paras's office, he realized it "wasn't [defendant's] attorney and it

was something bigger than [he] thought it was." He also told police that after the two left Paras's office, defendant waited in the driver seat of the Jeep for Paras to leave before accelerating to hit Paras with the vehicle as he left the office.

The police also learned that Nicholas Lucarella, an unsatisfied matrimonial client of Paras's,[3] had paid defendant $4,000 to assault but "not to kill" Paras, and that Lucarella met defendant through Edward Roger Caruso at a gym in Lodi. Caruso was an ex-Newark police officer who was then working as a private investigator. Caruso met defendant while performing investigative services for attorney Anthony Fusco in a different criminal matter involving defendant. The two met in Fusco's office where they "had an occasion to strike up a friendship and spent time either in . . . Fusco's office or on occasion to go out and have a bit[e] to eat and then return to Fusco's office."

At some point a few days after the assault, Caruso met with defendant and advised him that he should retain counsel in response to defendant telling Caruso that DeStefano's vehicle had been stolen and used in an assault, but defendant indicated that he did not think that would be necessary. On another occasion

---

[3] According to the State, Paras represented Lucarella in a post-judgment custody dispute that did not end in Lucarella's favor.

shortly after the assault, Caruso happened to meet defendant near a social club the latter frequented where defendant informed Caruso that he was going to Las Vegas, Nevada on vacation and would talk to a lawyer when he returned.

Before DeStefano left on vacation with defendant, on June 27, 2002, police took a statement from her, at which time they informed her that they wanted to speak to defendant. The next day, defendant and DeStefano traveled to Las Vegas, Nevada. A few days later, Las Vegas authorities arrested defendant and DeStefano on New Jersey criminal warrants.

While in custody in Las Vegas, defendant called Caruso seeking his help in obtaining a lawyer. Defendant asked Caruso to contact an attorney who was representing defendant in an unrelated homicide case, but that lawyer declined to represent defendant in this matter. Defendant ultimately retained Marc A. Calello in July 2002 at Caruso's suggestion. Thereafter, Caruso was engaged to assist Calello with defendant's defense beginning on September 12, 2002.

Caruso gave statements to the MCPO on November 25, 2002, and February 14, 2003,[4] in which he described his relationship with defendant and Lucarella and informed investigators of a payment Lucarella made to defendant,

---

[4] According to defendant, Caruso was represented during his statements to police by an attorney, Joseph Ferrante, who had been retained by Fusco for Caruso.

which Caruso witnessed. These statements were read to the grand jury on June 2, 2003.

At the time Caruso provided his statements to the MCPO, Fusco was representing Caruso's son in an unrelated criminal matter. Six years later, during Lucarella's trial for his role in Paras's assault, Caruso recanted a number of the statements he gave to police in 2002 and 2003, claiming that he gave them at Fusco's direction in exchange for Fusco's promise to use his influence to secure a favorable sentence for Caruso's son.[5]

On June 23, 2003, a Monmouth County Grand Jury indicted defendant, charging him with one count of first-degree attempted murder contrary to N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; one count of first-degree conspiracy to commit murder contrary to N.J.S.A. 2C:5-2(a)(1) and/or (2) and N.J.S.A. 2C:11-3; and one count of second-degree aggravated assault, contrary to N.J.S.A. 2C:12-1(b)(1).

---

[5] According to defendant, Fusco, who had admitted to having a relationship with Lucarella's ex-wife, feared he would be prosecuted in connection with Paras's assault and asked Caruso to lie to the grand jury in order to get Fusco "off the hook."

A-2504-18

After our remand, defendant filed his motion to change venue and to disqualify the MCPO, contending that members of that office, against which he had filed a civil suit, engaged in prosecutorial misconduct by, among other acts, taking a statement from Caruso who that office knew to be an investigator hired by defendant's attorney to assist in his defense. Moreover, he claimed that the judge assigned to the case was biased and conspired against him based on the judge's former position as the county sheriff.

Judge Lisa Thornton considered the motion and the parties' oral arguments on January 20, 2017, and May 3, 2017. On January 11, 2018, Judge Thornton issued an order denying defendant's motion and attached a twenty-three-page written decision in which she analyzed five "incidents" defendant cited to in support of his argument to disqualify the MCPO and to transfer venue because no Monmouth County judge could decide the case impartially. The judge stated the following:

> (1) he was allegedly assaulted over ten years ago in the Monmouth County Correctional Institution (MCCI) by officers that were sympathetic to attorney Anthony Fusco. He claims the officers feared defendant would implicate Mr. Fusco in the assault on Mr. Paras; (2) his conviction was vacated on appeal; (3) his civil case against the MCPO and the MCCI was dismissed by a

judge in the Monmouth County Civil Division; (4) his case was originally assigned to [a judge], who was the Monmouth County Sheriff when defendant was allegedly assaulted by officers at MCCI; (5) he was questioned by corrections officers at a NJ Department of Corrections prison, after he lost control of his temper in [the other judge's] courtroom during a court proceeding.

Judge Thornton concluded that no "reasonable fully informed person would . . . conclude that no judge in Monmouth County could be fair and impartial." She noted that defendant had provided no credible evidence that he had been assaulted by officers at MCCI, and that even if the assertion were true, there was "no reason to conclude" that the entire Monmouth judiciary would be prejudiced against defendant. She further found that the reversal of his conviction and the assignment of his case to the judge who was the former sheriff were not evidence of bias against him, noting that the other Law Division judges involved in his case demonstrated no "bias or animosity" against defendant and that when the matter had been assigned to the former sheriff, that judge was unaware of the lawsuit filed by defendant against MCCI during his tenure as the Monmouth County Sheriff.

Judge Thornton also explained that when this potential conflict was disclosed to the court, "the matter was transferred to . . . the Presiding Judge of the Criminal Division" in Monmouth County. She concluded that defendant had

10

failed to demonstrate that the newly assigned judge would not be impartial and noted that he had not yet been appointed to the bench at the time of defendant's arrest or alleged assault and had no prior involvement with his case.

Judge Thornton further found no merit to defendant's argument that the Monmouth judiciary should be recused because a judge in the Civil Division dismissed his lawsuit against the MCPO, MCCI, Fusco and Caruso. She noted that defendant failed to allege that the judge there erred in her decision and added that there was "no evidence that her decision was based on bias or malice against defendant."

Finally, Judge Thornton discussed an incident that occurred before the judge who was the former sheriff in which defendant, when advised that the judge would not be entertaining his motion to dismiss the indictment on that date, raised his voice and stated, "I know who you is. You were the sheriff's officer . . . . I know who the fuck you is. No, no you stop. Bastard. This ain't no fucking damn valid indictment. This ain't no valid indictment. I told 'em I don't want no goddamn deal." Following this incident, officers at a State prison facility questioned him about his behavior. Judge Thornton concluded there was nothing unusual about the officers' conduct in this situation and expressed that

11

it was "not clear why the court should consider this incident as evidence of bias on the part of the court."

Summarizing her findings as to defendant's claim that his case should be transferred away from Monmouth County, Judge Thornton stated:

> Unlike the facts in [State v. Dalal, 221 N.J. 601 (2015)], there is simply no basis to conclude that recusal is appropriate because a fully informed person would doubt the impartiality of the Monmouth County judiciary. On the contrary, defendant's moving papers indicate his request is motivated by his desire to "forum shop." He candidly admits that he would like the case moved to Essex County to be closer to his family.[6] Apparently, the fact that Mr. Paras, the victim of the assault, and his family would be inconvenienced by travelling [sic] to Essex County is of no concern to defendant.

Judge Thornton also found there was no reason for the MCPO to be disqualified, as there was "no evidence of 'widespread misconduct' or any other disqualifying conflict contemplated by the [c]ourt in [State v. Harvey, 176 N.J. 522 (2003)]." She found no support for defendant's argument that the MCPO violated his attorney-client privilege when they interviewed Caruso and allegedly received statements from him that both "implicated [defendant] and

---

[6] In his motion, defendant sought a change in venue to Essex County so it would be more convenient for his family and counsel.

 A-2504-18

revealed his trial strategy." She concluded that defendant had failed to satisfy his burden in demonstrating the statements were made during a "professional consultation" and noted that most of the communications were made before Calello had been retained as counsel and "had nothing to do with the attorney-client relationship."

Having said that, the judge described two conversations disclosed by Caruso which could have been privileged communications. The first involved Caruso's recruitment by Calello to perform investigatory actions with respect to a possible alibi for defendant. Following defendant's arrest in Las Vegas, Caruso advised defendant to schedule an appointment with Calello to discuss Calello's representation of defendant. Caruso informed an investigator that he "assumed the meeting took place because 'Mr. Calello called [him] in requesting certain investigator actions with respect to taking statements regarding a possible alibi.'" Judge Thornton stated that the communication could be considered "privileged" because "[i]t was a professional conversation between an attorney and his agent regarding tasks to be completed for defendant's defense." However, she concluded that defendant "was not prejudiced by this revelation" and had "failed to present any argument that he was." She explained

13

that had defendant intended to assert an alibi as a defense, he would have been required to provide that information to the MCPO pursuant to Rule 3:12-2.

The second conversation that could have been privileged was between Caruso and defendant when Caruso visited defendant in jail. While giving a second statement at the MCPO on February 14, 2003, Caruso was asked if he ever had conversations with defendant "concerning his idea of what the proofs of this case were." Caruso told the MCPO that defendant informed him "that the[ authorities] were looking for a white man, and . . . you can take me for a lot of things, but you can never take me for a white man."

Judge Thornton described the question as "inappropriate" and noted that the investigator "should have known that the question could have elicited responses that breached the attorney-client privilege." She reasoned that although the communication could have been privileged, as Caruso was likely "acting in his capacity as [defendant's] investigator," there was again no prejudice to defendant because of this revelation. She noted that there was "no indication in the record that law enforcement ever suspected Caucasian men were driving the Jeep Liberty." Judge Thornton therefore concluded that this statement did not demonstrate the "widespread misconduct" or a "disqualifying

14

conflict" that defendant needed to show to have the MCPO disqualified, and for those reasons, she denied defendant's motion.

C.

Defendant's motion to dismiss the indictment was heard by Judge Dennis R. O'Brien, who denied the motion on October 12, 2018, and set forth his reasons in a ten-page rider attached to his order. Judge O'Brien stated that defendant argued for the indictment's dismissal with prejudice for "three main reasons": (1) because "the MCPO improperly intruded into his attorney-client relationship, in violation of his Sixth Amendment right to counsel, by interviewing Caruso, a private investigator retained by [d]efendant's counsel"; (2) because "the presentation to the Grand Jury was fundamentally unfair because the Grand Jurors heard inaccurate and misleading evidence and because the State did not present the Grand Jury with exculpatory evidence"; and (3) "because the State exclusively relied on hearsay and double hearsay during the Grand Jury presentment, violating the [d]efendant's Fifth Amendment right to a fair Grand Jury."

Judge O'Brien found that the first issue raised by defendant was the "same allegation" that defendant had made in his first motion heard by Judge Thornton and that the issue had been "fully and fairly litigated." For that reason, Judge

O'Brien concluded that the "law of the case" doctrine applied to defendant's arguments concerning the MCPO's alleged intrusion on the attorney-client privilege, especially since defendant did not argue that the proceedings before Judge Thornton were "unfair or that the interests of justice otherwise require[d] th[e] motion to be re-litigated."

The judge then found defendant's second contention, that the State misled the grand jury by presenting Caruso's statements that were later recanted, to be without merit. Judge O'Brien observed that the recantation did not occur until "six years, four months, and twenty-eight days after" Caruso's original statements had been presented to the grand jury and the MCPO had no "actual knowledge" of it at the time of defendant's indictment. The judge also noted that even if the State had somehow known that Caruso would recant his statements six years after giving them, Caruso's recantation was not clearly exculpatory, as the grand jury would then have to decide whether his initial statement or recantation were truthful.

Finally, Judge O'Brien addressed defendant's argument that the indictment should be dismissed because the State relied exclusively on hearsay and double hearsay evidence. The judge rejected defendant's reliance upon State v. Chandler, 98 N.J. Super. 241 (Law Div. 1967) and State v. Costa, 109 N.J.

16

Super. 243 (Law Div. 1970) for the proposition that the State cannot rely on hearsay evidence during grand jury presentment, because neither case was still good law, nor were either of them binding authority. To the contrary, Judge O'Brien explained that a grand jury "may return an indictment based on hearsay testimony or other evidence which may not be legally competent or admissible at trial" and further noted that the New Jersey Rules of Evidence expressly provide for the relaxation of the evidence rules in grand jury proceedings.

Thereafter, defendant pled guilty again to the one count of aggravated assault,[7] while preserving his ability to appeal the denial of his pre-trial motions. On January 4, 2019, Judge O'Brien sentenced defendant in accordance with the terms of a negotiated plea agreement. This appeal followed.

## II.

We review a trial court's denial of a motion to dismiss an indictment for abuse of discretion, State v. Bell, 241 N.J. 552, 561 (2020) (quoting State v. Twiggs, 233 N.J. 513, 44 (2018)), and we apply the same standard in reviewing denials of motions to change venue under Rule 3:14-2, State v. Biegenwald, 106 N.J. 13, 33, 36 (1987), State v. Belton, 60 N.J. 103, 107 (1972), or to recuse a

---

[7] In doing so, defendant provided a factual basis for his plea—acknowledging that he had been paid money to assault Paras, that he had enlisted York's help to do so, and that they had used DeStefano's Jeep to strike Paras.

party or judge. Goldfarb v. Solimine, 460 N.J. Super. 22, 30 (App. Div. 2019). We will find an abuse of discretion only where "a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). When a trial court's decision turns on a legal question, we review that determination de novo, without deference to the trial court's interpretation. Twiggs, 233 N.J. at 532.

III.

A.

Guiding our review of the denial of a motion to dismiss an indictment is the principle that "[o]nce a grand jury returns an indictment, a court should dismiss that indictment 'only on the clearest and plainest ground, and only when the indictment is manifestly deficient or palpably defective.'" Bell, 241 N.J. at 560 (quoting Twiggs, 233 N.J. at 531-32). Dismissal of an indictment is a "last resort because the public interest, the rights of victims and the integrity of the criminal justice system are at stake." State v. Williams, 441 N.J. Super. 266, 272 (App. Div. 2015) (quoting State v. Ruffin, 371 N.J. Super. 371, 384 (App. Div. 2004)).

Where a motion to dismiss is based upon prosecutorial misconduct before the grand jury, dismissal is not required "[u]nless the prosecutor's misconduct . . . is extreme and clearly infringes upon the [grand] jury's decision-making function." Bell, 241 N.J. at 560 (alterations in original) (quoting State v. Murphy, 110 N.J. 20, 35 (1988)). Dismissal is only appropriate where "the prosecutor's conduct 'impinge[s] on a grand jury's independence and improperly influence[s] its determination.'" Id. at 561 (alterations in original) (quoting State v. Francis, 191 N.J. 571, 587 (2007)).

## B.

The gist of defendant's argument on appeal is that prior to the subject assault, he had an ongoing professional relationship with Caruso such that anything he discussed with Caruso was subject to the attorney-client privilege. Specifically, defendant argues his attorney-client privilege and, by extension, his right to effective counsel were violated when the MCPO improperly interviewed Caruso in November 2002 and February 2003—allegedly revealing his trial strategy in the process—while knowing that Caruso had been retained

19

as an investigator by defendant's counsel on September 12, 2002. Accordingly, he argues this improper questioning "mandates" dismissal of the indictment.[8]

Among the examples of revealed conversations upon which defendant asserts a violation the attorney-client privilege are: Caruso's statement that he was present when defendant purchased or leased a blue Jeep Liberty; Caruso telling the MCPO that he was contacted by defendant "[a] day or two after the incident" at which point he advised defendant "to get an attorney immediately"; a conversation following defendant's arrest in Las Vegas in which Caruso told defendant to "set up an appointment with Mr. Calello"; Caruso's statement that he "assumed that [the meeting] took place [because] Mr. Calello called [him] in requesting certain investigator actions with respect to taking statements regarding a possible alibi"; and defendant's statements that he liked Lucarella, was "gonna do [Lucarella] a favor," and that he planned to "rough[] up" an attorney for Lucarella. He also notes that authorities recorded a call between

---

[8] At several points, defendant states that the MCPO did not consider Caruso to be criminally involved in the attack on Paras in order to avoid a waiver of the attorney-client privilege pursuant to the "crime-fraud" exception. This exception, which provides that "communication[s] in the course of legal service sought or obtained in aid of the commission of a crime or a fraud" are not protected by attorney-client privilege, N.J.R.E. 504(2)(a), was not relied on by either Judge Thornton or Judge O'Brien, nor by the State in the instant appeal.

A-2504-18

Caruso, defendant, and DeStefano when the latter two were arrested in Las Vegas.

Defendant further points to Caruso's February 2003 statement to the MCPO wherein investigators asked Caruso whether he ever had "any conversations with [defendant] regarding his idea of what the proofs of this case were," to which Caruso responded as follows:

> He told me that he received word that they were looking for a bald shaved head black man who was very, very big. He said to me do I look big to you, I'm an average size guy. I had occasion to meet [defendant] in Garfield near a social club that he would frequent. He was standing on the corner with his brother when I arrived. His brother is his identical twin and they look similar, not exactly but similar. I told [defendant] that from what I could glean from the information he gave me that this case is strictly an identification case, and I pointed over to his twin brother and said maybe it was him. . . . Later on I think on one of my jail visits to him, he told me that they were looking for a white man, and he said you can take me for a lot of things, but you can never take me for a white man.

Defendant asserts that this inappropriate questioning by the MCPO revealed defendant's intent to use identity and alibi as trial strategies. Accordingly, defendant argues that taking the above statements and later presenting them to the grand jury constituted prosecutorial misconduct warranting the dismissal of his indictment. We disagree.

21

## C.

We conclude that defendant's contentions about the grand jury being exposed to information secured through the violation of his privileged communication with his attorney or his attorney's investigator are without any merit. While defendant correctly asserts that the attorney-client privilege exists to protect "communications between a client and his attorney," and "extends to consultations with third parties whose presence and advice are necessary to the legal representation," O'Boyle v. Borough of Longport, 218 N.J. 168, 185 (2014), he fails to recognize that the privilege does not protect all communications. Rather, the privilege only protects communications made between a "lawyer and his client in the course of that relationship and in professional confidence." Tractenberg v. Twp. of W. Orange, 416 N.J. Super. 354, 375 (App. Div. 2010) (quoting N.J.R.E. 504(1)). Regardless of whether the allegedly protected communication is made to a lawyer or the lawyer's agent, the "sine qua non of the privilege is that the client has consulted the lawyer in the latter's capacity as an attorney." L.J. v. J.B., 150 N.J. Super. 373, 377 (App. Div. 1977). See also Fellerman v. Bradley, 99 N.J. 493, 499 (1985) ("For a communication to be privileged it must initially be expressed . . . in conjunction with seeking or receiving legal advice from [an] attorney . . . ."). "The burden

of proof" to establish that a communication is protected by the attorney-client privilege rests with "the person . . . asserting the privilege." Hedden v. Kean Univ., 434 N.J. Super. 1, 12 (App. Div. 2013).

Accordingly, defendant had the burden of establishing that communications between he and his attorney—or he and his attorney's agent—were made within the context of the attorney-client relationship, not just that a "professional relationship" existed. Ibid. Defendant cites a number of interactions between himself and Caruso which were revealed to the MCPO and which implicate defendant in the assault on Paras; the revelation of which he asserts violated his attorney-client privilege—e.g., Caruso's statement that he was present when defendant purchased or leased a blue Jeep Liberty, Caruso's introduction of defendant to Lucarella, defendant's statement that he planned to "rough[] up" an attorney for Lucarella, defendant's request that Caruso put him in touch with an attorney, and defendant's statement to Caruso at a Garfield social club days after the incident that the authorities were looking for a black man in connection with the assault. However, these interactions all occurred well before Caruso's retention by Calello to work on defendant's case. Rather, each instance arose from the personal relationship that existed between Caruso and defendant. Such a relationship does not render all communications between

them consultations with an agent "in the latter's capacity as an [agent of an] attorney," L.J., 150 N.J. Super. at 377, and is insufficient to sustain defendant's burden to afford these conversations protection under the attorney-client privilege. Accordingly, Judge Thornton did not err in finding that the privilege did not apply to those conversations.

With respect to the two instances in which Judge Thornton found the attorney-client privilege to apply, she correctly found that neither warranted the recusal of the MCPO because neither instance prejudiced defendant. As to defendant's assertion that his defense of alibi was revealed when Caruso informed investigators that "Calello called [him] in requesting certain investigator actions with respect to taking statements regarding a possible alibi," Judge Thornton appropriately noted that information would have had to have been provided to the prosecutor's office in discovery anyway if defendant sought to establish an alibi defense. Where the defense is asserted, defendant is obligated by Rule 3:12-2 to advise the State pretrial as to the "place or places at which [he] claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely."

Moreover, Judge Thornton accurately noted that defendant was not prejudiced by the revelation of his statement to Caruso while defendant was in

jail that investigators were looking for a Caucasian man—a fact that is not changed by defendant's insistence that the judge overlooked Caruso's suggestion earlier in the same statement that the case was merely an "identification" case. Critically, Caruso's designation of defendant's case as one of "identification" occurred when Caruso met defendant near the social club—before Caruso was retained—and was thus not protected by the attorney-client privilege as previously explained. In any event, defendant has not argued how exactly he was prejudiced, he merely states that "it is difficult to imagine a more prejudicial statement than a defense investigator revealing the defense strategy (misidentification/possible alibi)." In short, there were no protected communications that prejudicially revealed a misidentification strategy, and as before, if defendant sought to establish an alibi defense, he would have had to disclose that information to the MCPO. Accordingly, Judge Thornton appropriately concluded that there was no breach of the attorney-client privilege that warranted recusal of the MCPO.

IV.

We reach the same conclusion as to defendant's challenge to Judge O'Brien's reliance on Judge Thornton's findings and applying the law of the case doctrine to defendant's attorney-client privilege claims when rejecting

25

defendant's motion to dismiss the indictment. The doctrine generally prohibits a second judge, in the absence of additional developments or proofs, from differing with an earlier ruling. See Lombardi v. Masso, 207 N.J. 517, 538-39 (2011). "It is a non-binding rule intended to 'prevent relitigation of a previously resolved issue.'" Id. at 538 (quoting In re Estate of Stockdale, 196 N.J. 275, 311 (2008)).

"A hallmark of the law of the case doctrine is its discretionary nature, calling upon the deciding judge to balance the value of judicial deference for the rulings of a coordinate judge against those 'factors that bear on the pursuit of justice and, particularly, the search for truth.'" Id. at 538-39 (quoting Hart v. City of Jersey City, 308 N.J. Super. 487, 498 (App. Div. 1998)). While the law of the case doctrine is a discretionary, non-binding rule, "[p]rior decisions on legal issues should be followed unless there is substantially different evidence at a subsequent trial, new controlling authority, or the prior decision was clearly erroneous." Sisler v. Gannett Co., 222 N.J. Super. 153, 159 (App. Div. 1987).

We do not discern any abuse of Judge O'Brien's discretion in this case. The judge appropriately noted that the facts and arguments again advanced by defendant as to whether a violation of the attorney-client privilege had occurred were the same—there was no new or different evidence nor any new authority,

and as we have now confirmed, her conclusions were legally correct. Furthermore, as already discussed, Judge Thornton's findings were not clearly erroneous. As such, Judge O'Brien was legally permitted to apply the law of the case doctrine, and appropriately did so.

V.

We turn next to defendant's argument that the prosecution's reading of Caruso's statements to the grand jury that Caruso later recanted constituted prosecutorial misconduct. We conclude this contention is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Suffice it to say there was no indication that when the prosecutor presented Caruso's statement to the grand jury that the prosecutor had reason to know Caruso would recant six years later. Moreover, because "[r]ecantation testimony is generally considered exceedingly unreliable," State v. Hogan, 144 N.J. 216, 239 (1996), Caruso's recantation did not give rise to exculpatory evidence. See id. at 237-38 (stating a prosecutor is only required at the grand jury stage to present evidence contrary to the State's position in the rare circumstance where the prosecution has "actual knowledge" of evidence that both "directly negates guilt" and is "clearly exculpatory"); see also State v. Scherzer, 301 N.J. Super. 363, 427-28 (App. Div. 1997) (stating evidence is not clearly exculpatory where

its presentation would require the grand jury to make a credibility determination).

## VI.

Equally without merit is defendant's contention that the grand jury impermissibly relied on hearsay evidence. Contrary to defendant's contention, as Judge O'Brien found, courts have long recognized that indictments "may be based largely or wholly on hearsay and other evidence which may not be legally competent or admissible at . . . trial." State v. Holsten, 223 N.J. Super. 578, 585 (App. Div. 1988) (emphasis added) (quoting State v. Schmidt, 213 N.J. Super. 576, 584 (App. Div. 1986)), rev'd on other grounds, 110 N.J. 258 (1988); see also State v. Scherzer, 301 N.J. Super. 363, 428 (App. Div. 1997). Moreover, an indictment need not be dismissed where hearsay or even "highly prejudicial" evidence has been presented to the grand jury where the grand jury process itself has not been shown to be unfair. Scherzer, 301 N.J. Super. at 428-29.

## VII.

Finally, we also find no basis for Judge Thornton to have changed the venue of defendant's case to another vicinage. Here, we find no reason to disturb the judge's discretionary determinations that defendant failed to demonstrate how the judge to whom his case was last assigned was biased and, for that

reason, a change of venue was not warranted. See Dalal, 221 N.J. at 606-07. As the State pointed out in its brief, the judges with whom defendant perceived he had issues had either retired or recused themselves. There was no reason to change the venue.

## VIII.

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they too are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2504-18