SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Bradley C. Thompson (A-41-20) (085260)**

**Argued November 9, 2021 -- Decided June 2, 2022**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

N.J.S.A. 2C:1-6(c) states that in cases involving DNA evidence, the time for prosecuting an offense under a statute of limitations "does not start to run until the State is in possession of both the physical evidence and the DNA . . . evidence necessary to establish the identification of the actor by means of comparison to the physical evidence."  (emphasis added).  The question before the Court in this matter of statutory interpretation is whether the limitation period begins to run when the State is in physical possession of the two items noted, or when the State obtains a match between the DNA evidence from the crime and the defendant's DNA sample.

In July 2001, victim C.S. was sexually assaulted by an unknown assailant. The New Jersey State Police Lab (the Lab) created a profile for the suspect's DNA sample, Specimen 12A, retrieved from C.S.'s body.  In 2002, the Lab entered the DNA profile into CODIS, the Combined DNA Index System, which is a national DNA database maintained by the Federal Bureau of Investigation (FBI).  The DNA profile entered into CODIS did not include certain exclusionary data -- data the Lab believed was inconclusive based on its interpretation of the FBI's DNA database polices.  Without that data, it would have been impossible for Specimen 12A to generate a match with another DNA profile entered into CODIS.  In 2004, defendant's DNA sample was collected in an unrelated matter and his DNA profile was entered into CODIS in 2006.  As a result of the manner in which the DNA profile for Specimen 12A was entered into CODIS, no match resulted.

The National DNA Index System (NDIS) is part of CODIS and contains the DNA profiles contributed by participating forensic laboratories.  In 2010, the FBI updated the NDIS Operational Procedures Manual to explicitly allow the exclusionary data withheld from Specimen 12A to be entered into the system.  The Lab did not update its policy to reflect this change in guidance until 2016.  In 2016, the Lab entered the subject exclusionary data for Specimen 12A into CODIS and was alerted that Specimen 12A matched defendant's DNA sample that had been entered into CODIS years earlier.

1

Based on that match, defendant was indicted in May 2017 for several offenses related to the July 2001 sexual assault. Defendant filed a pretrial motion to dismiss, arguing that the five-year statute of limitations began to run in 2004, when the State possessed both the physical evidence from the crime and defendant's DNA sample. The trial court denied his motion and concluded that the statute of limitations started running when the State had evidence of a match. At trial, defendant was convicted of fourth-degree criminal sexual contact and fourth-degree criminal trespass. The Appellate Division affirmed defendant's conviction, finding that the statute of limitations began to run in 2016 when the State received a DNA match.

The Court granted defendant's petition for certification. 245 N.J. 457 (2021).

**HELD:** A plain reading of N.J.S.A. 2C:1-6(c) reveals that the Legislature intended the statute of limitations to begin to run once the State was in possession of both the physical evidence from the crime and the suspect's DNA. To hold otherwise would contradict the language of the statute which directs the statute of limitations to begin when the State is in possession of both items needed to generate a match. To find that the statute of limitations begins when a match is confirmed would render the second half of the provision superfluous. Here, the statute of limitations began to run in 2010, when the FBI's updated scientific guidance rendered the Lab capable of generating a match based on the DNA samples in its possession.

1. The statute of limitations in a criminal statute is a complete defense to the prosecution of the crime. It is designed to protect a defendant from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. The five-year statute of limitation for most crimes begins "to run on the day after the offense is committed." N.J.S.A. 2C:1-6(c). N.J.S.A. 2C:1-6(c) carves out an exception for circumstances in which the prosecution includes DNA or fingerprint evidence. In those cases, "time does not start to run until the State is in possession of both the physical evidence and the DNA or fingerprint evidence necessary to establish the identification of the actor by means of comparison to the physical evidence." Ibid. (pp. 21-22)

2. A plain reading of N.J.S.A. 2C:1-6(c) reveals that the statute of limitations, in cases involving DNA evidence, begins to run when "the State is in possession of" two things: (1) the physical evidence from the crime and (2) the DNA of the suspect. Those are the two items "necessary to establish the identification of the actor by means of comparison" because the two DNA samples can be compared to determine whether they match. It is unlikely that the Legislature contemplated a situation in which the State would possess both items necessary to generate a match but that the DNA match would not occur given the systems in place to coordinate, maintain, and compare DNA samples both locally and nationally. Any other reading of the statute would permit the State to be in possession of physical evidence from a crime scene

2

and DNA evidence from a suspect and yet allow that evidence to go untested for an inordinate amount of time, thereby tolling the statute of limitations. That was certainly not the Legislature's expectation when it created the carve out to the five-year statute of limitations for cases involving DNA evidence. (pp. 24-26)

3. Were the Court to substitute the word "match" for the terms "physical evidence and DNA," then the statute would prescribe that the statute of limitations begins when the State is in possession of a <u>match</u> necessary to generate a <u>match</u>. That reading leads to an illogical interpretation of the statute and renders the second half of that clause superfluous. If the Legislature contemplated that a match would trigger the start of the statute of limitations, it undoubtedly could have easily said so. Furthermore, that interpretation completely ignores the language that states the time does not begin "until the State is in possession of <u>both</u> the physical evidence and the DNA." In using the term "both," the Legislature signaled that the two items that follow the term are the items the State must be in possession of in order to start the clock. (pp. 27-28)

4. Although N.J.S.A. 2C:1-6(c) requires the statute of limitations to begin when the State is in possession of the physical evidence and the DNA sample, there may be situations in which the science or the generally accepted scientific guidance at the moment those items come into the State's possession has not advanced so far as to allow for that evidence to actually generate a match. If the State possessed a sample but the technology had yet to evolve to allow a usable DNA profile to be created, or if the method of analysis that would lead to a match has not been officially adopted within the scientific community, then regardless of whether the State possesses the evidence, the statute of limitations does not start to run. (p. 30)

5. Here, there was a lack of clarity at the Lab, and perhaps the scientific community at large regarding the utility of including exclusionary data within DNA profiles. However, there was no uncertainty regarding the use of that data by 2010 when the FBI updated the NDIS manual. Once the NDIS manual gave the go-ahead for including the exact information in a DNA profile that the Lab previously excluded for Specimen 12A, the Lab was on notice and effectively had all the evidence it needed as well as the scientific capability and guidance to generate a match. Consequently, the statute of limitations began to run in 2010, and defendant's 2017 indictment was well beyond the five-year limitations period. (pp. 31-32)

**REVERSED and REMANDED for defendant's convictions to be vacated.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion. JUDGE FUENTES (temporarily assigned) did not participate.**

# SUPREME COURT OF NEW JERSEY
## A-41 September Term 2020
## 085260

State of New Jersey,

Plaintiff-Respondent,

v.

Bradley C. Thompson,
a/k/a Brad Thompson and
Barton C. Thompson,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| November 9, 2021 | June 2, 2022 |

Stephen W. Kirsch, Designated Counsel, argued the
cause for appellant (Joseph E. Krakora, Public Defender,
attorney; Stephen W. Kirsch, on the briefs).

Lauren Bonfiglio, Deputy Attorney General, argued the
cause for respondent (Andrew J. Bruck, Acting Attorney
General, attorney; Lauren Bonfiglio, of counsel and on
the briefs).

Michael J. Zoller argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Pashman Stein Walder Hayden, attorneys; Michael J.
Zoller, and CJ Griffin, on the brief).

In the twenty-first century, the use of DNA (deoxyribonucleic acid) to identify perpetrators of crime has become commonplace. Indeed, many laypersons are familiar with the fact that traces of genetic material retrieved from crime scenes can lead law enforcement to the offender if that person's DNA matches the DNA found at the scene.

N.J.S.A. 2C:1-6(c) states that in cases involving DNA evidence, the time for prosecuting an offense under a statute of limitations "does not start to run until the State is in possession of <u>both</u> the physical evidence and the DNA . . . evidence necessary to establish the identification of the actor by means of comparison to the physical evidence." (emphasis added). The question before the Court in this matter of statutory interpretation is whether the limitation period begins to run when the State is in physical possession of the two items noted, or when the State obtains a match between the DNA evidence from the crime and the defendant's DNA sample.

In July 2001, victim C.S. was sexually assaulted in her home by an unknown assailant. Traces of the suspect's DNA were retrieved from C.S.'s body and sent to the New Jersey State Police Lab (the Lab or the State Lab). There, scientists created a DNA profile for the sample, Specimen 12A, and in

2002 entered it into CODIS, the Combined DNA Index System, which is a national DNA database maintained by the Federal Bureau of Investigation (FBI). The DNA profile created by the Lab and entered into CODIS did not include certain exclusionary data -- data the Lab believed was inconclusive based on its interpretation of the FBI's DNA database polices. Without that data, however, it would have been impossible for Specimen 12A to generate a match with another DNA profile entered into CODIS. In January 2004, defendant's DNA was entered into CODIS on an unrelated matter. As a result of the manner in which the DNA profile for Specimen 12A was entered into CODIS, no match resulted.

In 2010, the FBI updated its guidance to explicitly allow the exclusionary data withheld from Specimen 12A to be entered for DNA profiles. The Lab did not update its policy to reflect this change in guidance until 2016. In 2016, an internal Lab audit revealed that Specimen 12A was entered without the subject exclusionary data. Upon entering the data for Specimen 12A, a match occurred, alerting the Lab that Specimen 12A matched defendant's DNA sample that had been entered into CODIS years earlier. Based on that match, defendant was indicted in May 2017 for several offenses related to the July 2001 sexual assault.

3

Prior to trial, defendant filed a motion to dismiss several counts on statute of limitations grounds. He argued that, pursuant to N.J.S.A. 2C:1-6(c), the five-year statute of limitations for the criminal offenses began to run in 2004, when the State possessed both the physical evidence from the crime and defendant's DNA sample. The trial court denied his motion and the case proceeded to trial. At trial, defendant was convicted of fourth-degree criminal sexual contact and fourth-degree criminal trespass. Defendant appealed and the Appellate Division affirmed his conviction and sentence finding that the statute of limitations began to run not in 2004, but in 2016 when the State received a DNA match between the DNA sample collected from the victim and defendant's DNA sample.

We hold that a plain reading of N.J.S.A. 2C:1-6(c) reveals that the Legislature intended the statute of limitations to begin to run once the State was in possession of both the physical evidence from the crime and the suspect's DNA. To hold otherwise would contradict the language of the statute which directs the statute of limitations to begin when the State is in possession of both items needed to generate a match. To find that the statute of limitations begins when a match is confirmed would render the second half of the provision superfluous.

4

In this case, although the State was in possession of both the physical evidence from the crime and defendant's DNA by 2004, the science regarding the utility or ability to enter certain exclusionary data in the FBI database was unclear. Clarity was achieved, however, in 2010 when the FBI updated its guidance to note that such data could be included on a DNA profile. At that time, the State was in possession of all it needed to generate a match and the scientific guidance on the treatment of DNA profiles and exclusionary data had been updated.

We therefore find that the statute of limitations began to run in 2010, when the scientific guidance rendered the Lab capable of generating a match based on the DNA samples in its possession. By the time defendant was indicted in 2017, the five-year statute of limitations had expired. We therefore reverse the Appellate Division's judgment and remand the matter for defendant's convictions to be vacated.

I.

A.

On the night of July 21, 2001, C.S.[1] was home with her four-month-old baby. An unknown male entered the home through an unlocked back door and sexually assaulted C.S. The intruder grabbed C.S. from behind, covered her

---

[1] Initials are used to protect the identity of the victim in this matter.

5

eyes with his hand, gripped her throat, and pulled her hair as he dragged her down the hallway, eventually throwing her on the bathroom floor. In the bathroom, the man covered C.S.'s head with a towel and took off her clothes and bra. The assailant proceeded to touch C.S.'s breasts with his hands and mouth, and he touched her genital area with his fingers and his stomach. He then forced C.S. to perform oral sex on him. The assailant did not ejaculate during the encounter. Before leaving, he told C.S. to count to ten and instructed her not to call the police.

The next day, on July 22, 2001, C.S. reported the sexual assault to the police and underwent an examination by a Sexual Assault Nurse Examiner (SANE), who collected specimen swabs from C.S.'s body.

B.

Federal Operational Guidelines and DNA

Before detailing the background of the procedures that eventually led to the DNA match in this case, we provide the following summary of the federal operational guidelines for DNA identification.

The Federal DNA Identification Act sets out detailed participation requirements for state and local forensic DNA laboratories to participate in CODIS. See DNA Identification Act of 1994, 34 U.S.C. § 12592. CODIS, the Combined DNA Index System, refers to a national identification index of

criminal justice DNA databases and the software used to run these databases to compare a target DNA record against the DNA records in the database.  FBI, CODIS and NDIS Fact Sheet CODIS, https://www.fbi.gov/services/laboratory/biometric-analysis/codis/codis-and-ndis-fact-sheet#CODIS (last visited May 11, 2022).  CODIS enables the storage, exchange, and comparison of DNA records among forensic DNA laboratories in participating states.  Ibid.  The National DNA Index System (NDIS) is one part of CODIS and simply contains the DNA profiles contributed by participating federal, state, and local forensic laboratories. Ibid.

In 1997, a consortium of twenty-one laboratories determined the best thirteen short tandem repeats (STR) locations within a DNA sample/sequence to use in the CODIS databank; those thirteen markers are commonly referred to as the "CODIS core loci."  Ming W. Chin et al., Forensic DNA Evidence: Science and the Law § 2.4 (2021).

Visually, loci appear as "peaks" within a studied DNA sample, with "the height of the peak" being "directly proportional to the amount of DNA

7

amplified." See Chin, § 3.4.[2]  Because the size of a peak correlates to the amount of DNA, a peak must meet an analytical threshold set by the laboratory to be included among the loci for a particular sample, and "[p]eaks that do not cross the analytical threshold are considered indistinguishable from background fluorescence and are not labeled by the software." Ibid.  Thus, peaks below the analytical threshold are not labeled as loci and "are typically not used for data interpretation." Ibid.  Simply put, peaks below the analytical threshold that each laboratory sets are considered exclusionary data; those peaks are omitted from the database's index as loci.[3]

Once a laboratory possesses a DNA sample, it must have a second DNA sample "composed of the same markers [or loci] with which to compare it" to make an identification.  Ibid.  A "match" occurs "when CODIS links two or more DNA profiles and a confirmation process is started by designated laboratory personnel from each affected laboratory."  NDIS Operational Procedures Manual Glossary (eff. Jan. 1, 2015).  In the process of comparing DNA samples, a "hit" is "[a] confirmed match that aids an investigation."

---

[2]  Once DNA is amplified, scientists capture the "intensity of the fluorescence, and ultimately the height of the peak," which "is measured in relative fluorescence units (RFUs)."  Ibid.

[3]  When we use the term "exclusionary data," we are referring to the DNA peaks below the analytical threshold set by laboratories that are excluded from the database.

8

Ibid. Significantly, a sample cannot yield a match or ensuing hit in the system if the DNA profile as a whole contains fewer than seven testable CODIS Core loci.

According to Ayva Sammel, the New Jersey State Lab's CODIS administrator, once CODIS generates a hit, the laboratory must "do an administrative check of the case file to make sure that [the] specimen ID goes with that case." Sammel also testified that a laboratory will confirm a "hit" after "making sure . . . that the offender sample has been re-run to determine that the profile is concordant with the one that was in the database that matched." Sammel stated that New Jersey laboratories require a confirmatory buccal swab to establish a chain of custody for use at trial; once that chain is established, a laboratory analyst can testify at trial as to the confirmed identity of the individual that produced a match and a subsequent hit in CODIS.

C.

Specimen 12A

On July 26, 2001, the New Jersey State Police Lab received the samples that had been collected during C.S.'s examination by the SANE nurse. On January 23, 2002, the Lab released its report. Specimen 12A, a breast swab sample, was of particular interest because it contained dried saliva and C.S. was not a contributor.

In 2002, the Lab entered the DNA profile of the contributor of Specimen 12A into CODIS.[4]  From Specimen 12A, Lab analysts retrieved 5 loci with peak heights of at least 100 RFUs.  Between at least 2001 and 2006, the State Lab had an internal, unwritten policy that when entering "any peaks in a DNA profile that could be considered conclusive for match purposes," the RFU peak height had to be 100 at minimum.[5]  Consequently, loci with peaks below 100 RFUs were not included in the Lab's report.  Specimen 12A's DNA profile was entered into CODIS with the 5 loci that had peak heights of at least 100 RFUs, but according to Sammel, it would have been impossible to generate a match because at least "[7] locations [we]re needed for a forensic hit."

On January 29, 2004, the Juvenile Justice Commission, acting in an unrelated matter, collected a buccal swab with defendant Bradley Thompson's DNA and submitted it to the Lab for analysis and entry into CODIS.  After a two-year backlog, on April 20, 2006, the Lab finally entered defendant's DNA profile into CODIS.  The entry did not result in a match.  Because the State

---

[4]  In New Jersey, "[w]hen the Forensics Office receives a DNA sample, it analyzes the sample to create a DNA profile and then forwards that profile to the FBI to be uploaded to CODIS."  In re Investigation of Burglary & Theft, 240 N.J. 436, 441 (2020) (citing N.J.S.A. 53:1-20.21)).

[5]  In 2002, the policy to exclude from DNA profiles RFU peak heights below 100 was not written in the NDIS manual or the Lab's own procedural manual, but analysts entering information into CODIS interpreted the NDIS policy to exclude such data.

Lab analysts entered only five loci into CODIS for Specimen 12A -- and not the exclusionary data (peak heights under 100 RFUs) that would have produced the minimum seven loci necessary to produce a match -- defendant's DNA profile did not generate a match with any profile in the system when entered in 2006.

In 2010, the FBI updated the NDIS Operational Procedures Manual (NDIS manual) to reflect that exclusionary data could be entered into the system.[6] But the Lab did not change its procedures in 2010 in accordance with the updated NDIS manual.

In 2014, the Lab initiated a self-audit of DNA samples. According to Sammel, in 2016, she reached out to Dr. Douglas Hares from the FBI who informed her that, although exclusionary data was permitted to be entered into CODIS before 2010, the NDIS manual had been updated in 2010 to include a written policy clarifying that exclusionary data could be entered into CODIS. The Lab in 2016 then updated its procedures to expressly allow entry of such exclusionary data, which in turn would expand the reported information to include additional loci with peaks under 100 RFUs.

---

[6] The record contains the 2015 NDIS manual, and the parties agree that the 2010 manual was updated to clarify that exclusionary data could be entered into CODIS. The 2010 manual is not part of the record.

11

In March 2016, a "quality search" during the audit alerted a Lab analyst that exclusionary data for Specimen 12A had not been entered into CODIS and that there was therefore an insufficient number of loci to produce a match or a hit for that sample. The Lab then reentered the data for Specimen 12A, including peaks under 100 RFUs, into CODIS, which finally returned a match for that sample. The match indicated that Specimen 12A, the sample taken from victim C.S., matched the DNA sample collected from defendant during the unrelated juvenile matter in 2004.

On May 18, 2016, the Lab informed the New Jersey State Police of a "possible investigative lead" in reference to Specimen 12A and defendant's buccal swab. The Lab also informed the police that it could not reach a conclusion until it obtained a confirmatory buccal swab from defendant, as required by standard procedure.

On July 13, 2016, defendant submitted a buccal swab, which the Lab received for analysis on July 21, 2016.[7] On August 17, 2016, the Lab confirmed there was a hit between the buccal swab taken from defendant on July 13, 2016 and Specimen 12A.

---

[7] The police officer who obtained the buccal swab dated the consent form July 13, 2016, but defendant dated it as October 13, 2016. Because the Lab received the sample for analysis on July 21, 2016, we accept July 13, 2016 as the date of the buccal swab. The earlier date does not prejudice defendant.

12

In May 2017, a Camden County Grand Jury indicted defendant on the following nine counts:  three counts of first-degree aggravated sexual assault (counts one through three); three counts of first-degree sexual assault (counts four through six); two counts of third-degree aggravated sexual contact (counts seven and eight); and one count of second-degree burglary (count nine).

In a pretrial motion, defendant moved to dismiss counts one to three and counts seven to nine on statute-of-limitations grounds.  He argued that, pursuant to N.J.S.A. 2C:1-6(c), the statute of limitations on those charges began to run in 2004 when the State had in its possession the two items necessary to generate a match -- the physical evidence from the crime and defendant's DNA sample.  The trial court disagreed and denied the motion.  In its decision, the court reasoned that to calculate the start-time for a limitations period under N.J.S.A. 2C:1-6(c), the proper inquiry "is what was necessary for the State to establish the identification of this defendant to the specimen that they had in their possession."  The court noted that the comments to the statute reveal the Legislature's intent that for "DNA and fingerprint evidence . . . the time period does not begin to run until the prosecution gets that evidence, not only the samples, but the evidence of a match."

Additionally, the court found that the State did not complete the testing until 2016 because the Lab had followed the then-current policies, and the "science evolv[ed] here." The court concluded that, for purposes of N.J.S.A. 2C:1-6(c), the Lab obtained the necessary evidence during the 2016 audit when it changed its policy to include exclusionary data and Specimen 12A produced a hit to defendant's 2004 sample.

On January 12, 2018, after defendant filed a motion for leave to appeal to the Appellate Division, the trial court issued supplemental findings. It distinguished State v. Twiggs, 445 N.J. Super. 23, 31 (App. Div. 2016), from the present case and noted that it was guided by the Code's commentary to N.J.S.A. 2C:1-6(c), which interprets the statute of limitations to start running when the State has evidence of a match. The court, however, acknowledged that the commentary is not itself law.

The Appellate Division denied defendant's interlocutory appeal of the trial court's dismissal of the motion.

Defendant proceeded to trial. Midtrial, the trial court found insufficient evidence of severe personal injury; thus, the court granted defendant's motion for judgment of acquittal on counts four to six and on count eight.[8] On May 3,

---

[8] Although the record indicates that the trial court renumbered the counts on the verdict sheet, the court entered a judgment of acquittal on count eight of the indictment, as identified above.

14

2018, the jury acquitted defendant of all remaining counts, but convicted defendant of lesser-included offenses under counts seven and nine -- fourth-degree criminal sexual contact and fourth-degree criminal trespass, respectively.

On May 31, 2018, the court sentenced defendant to an eighteen-month prison term on the fourth-degree criminal sexual contact conviction, with nine months of parole ineligibility, and a consecutive fifteen-month prison term on the criminal trespass conviction, with no parole ineligibility.

### B.

Defendant appealed, arguing that counts seven and nine should have been dismissed because the State possessed the DNA needed to generate a match in 2004, twelve years before the indictment. Defendant further argued that the trial court relied on an unofficial code commentary to make its decision, that dicta in State v. Twiggs, 233 N.J. 513 (2018), supports his statutory interpretation of "in possession," and that prosecuting after the statute of limitations expired prejudiced him. Defendant also contended the sentence imposed by the trial court was manifestly excessive.

The Appellate Division affirmed defendant's conviction and sentence in an unpublished decision. The Appellate Division reviewed the statutory construction issue de novo and found that the statute of limitations started to

run on August 17, 2016, when the State possessed the conclusive hit between defendant's confirmatory DNA sample and Specimen 12A.

First, the Appellate Division held that under the statute's plain meaning, the statute of limitations began to run at the moment the confirmatory sample evidence was matched by the State, rather than the moment the evidence required to make a match was in the State's possession. The court reasoned that the match itself constitutes evidence sufficient to establish the suspect's identity by comparing the DNA evidence and physical evidence.

Second, the appellate court agreed that Twiggs did not apply because the facts of the Twiggs companion cases were insufficiently related to the circumstances in this case. The court did not directly address defendant's argument regarding the trial court's reliance on unofficial code commentary.

Third, the Appellate Division held that defendant was not prejudiced by the statute of limitations because, although the Legislature and the Court have recognized that defendants have a right to timely prosecution, DNA evidence is uniquely reliable and can be used long after commission of a crime. The Appellate Division agreed with the trial court that the Lab did not have the scientific capability to make a match until 2016 when the Lab updated its procedure. It concluded that "the passage of time did not force defendant to

16

defend himself against stale evidence because the prosecution's case was based almost entirely on DNA evidence."

We granted defendant's petition for certification. 245 N.J. 457 (2021). We also granted amicus curiae status to the Association of Criminal Defense Lawyers of New Jersey (ACDL).

## III.

### A.

Defendant argues that the Appellate Division erred in affirming his conviction and sentence. Defendant argues that N.J.S.A. 2C:1-6(c)'s plain language provides that the State's possession of both the physical evidence and the DNA or fingerprints is the triggering event -- not when the State confirms a match. Defendant contends that the counts in question were time-barred because he was not indicted within five years of the possession of both the sample found on the victim and defendant's DNA in 2004; the entry of defendant's DNA into CODIS in 2006; or the update of the FBI's NDIS manual in 2010. The match, defendant contends, did not happen until the State entered additional information from Specimen 12A into CODIS in 2016 -- information the State had in its possession since 2002.

Defendant further argues that the trial court and the Appellate Division misinterpreted the statute's plain language reading of "in possession" to equate

to the discovery of a match.  Additionally, defendant contends that both earlier courts failed to narrowly construe the statutory exception as required by Twiggs.

The ACDL supports defendant's position and adds that Twiggs demands the Court to narrowly construe the plain language of the DNA-tolling provision.  The ACDL stresses two errors:  the trial court conflated possession and discovery, and the Appellate Division "misconstrued the language in 'evidence necessary to establish the identification' with an actual match."

### B.

The State argues that the Appellate Division properly affirmed defendant's conviction because the plain language of N.J.S.A. 2C:1-6(c) requires the statute of limitations to begin when the State possesses a DNA match of evidence with a chain of custody that establishes identification of the actor by comparison to physical evidence.  The State interprets the exception to allow the statute of limitations to begin to toll once the State possesses a match of the physical evidence and the DNA evidence.  Applying that definition, the State argues that the statute of limitations started to run either on "July 13, 2016, when the State received defendant's confirmatory sample" or on "August 17, 2016, when the State had a conclusive match between defendant's DNA profile and the DNA profile from Specimen 12A."  The

18

State also maintains that "the meaning of the DNA-tolling provision is clear and unambiguous on its face," and the only logical reading is that the statute of limitations begins when the DNA is matched.

The State concedes that it possessed defendant's DNA in 2004, but maintains that the Lab's policies regarding entry of exclusionary loci made it impossible at that time to produce an initial match and thereafter establish the perpetrator's identity through a confirmatory sample. Either way, the State maintains, defendant's May 2017 indictment occurred within the five-year statute of limitations.

## IV.

### A.

We ordinarily review the dismissal of an indictment under an abuse of discretion standard. Twiggs, 233 N.J. at 532. "When the decision to dismiss relies on a purely legal question, however, we review that determination de novo." Ibid. Particularly in the interpretation of statutes, "we owe no deference to the interpretive conclusions of either the trial court or the Appellate Division." State v. Ferguson, 238 N.J. 78, 93 (2019).

### B.

To interpret the Legislature's meaning in N.J.S.A. 2C:1-6(c), we look to established principles of statutory construction.

19

The principal objective "of statutory interpretation is to determine and give meaning to the Legislature's intent." State v. Carter, 247 N.J. 488, 513 (2021). To do so, as always, we must first look at the plain language of a statute. Twiggs, 233 N.J. at 532. That is because the plain language is typically "'the best indicator' of legislative intent." Ibid. (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "If the text of the law is clear, the 'court's task is complete.'" Carter, 247 N.J. at 513 (quoting State v. Lopez-Carrera, 245 N.J. 596, 613 (2021)).

To that end, we give words "their generally accepted meaning." Ibid. (quoting N.J.S.A. 1:1-1). And we "read them in context with related provisions so as to give sense to the legislation as a whole." DiProspero, 183 N.J. at 492. "Where a specific definition is absent, '[w]e must presume that the Legislature intended the words it chose and the plain and ordinary meaning ascribed to those words.'" Twiggs, 233 N.J. at 532 (alteration in original) (quoting Paff v. Galloway Township, 229 N.J. 340, 353 (2017)).

Only when a statute contains ambiguous "language that leads to more than one plausible interpretation" should courts "turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" DiProspero, 183 N.J. at 492-93 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

"In keeping with standard canons of statutory construction, it is not the general rule, but rather the exceptions that are to be construed narrowly." In re Expungement Application of P.A.F., 176 N.J. 218, 223 (2003).

C.

The statute of limitations in a criminal statute is a complete defense to the prosecution of the crime. State v. Cagno, 211 N.J. 488, 506 (2012). "[A] statute of limitations is not intended to assist the State in its investigations; it is intended to protect a defendant's ability to sustain [a] defense." Twiggs, 233 N.J. at 539. In criminal cases, a statute of limitations "protect[s] individuals from charges when the basic facts have become obscured by time." State v. Diorio, 216 N.J. 598, 612 (2014); State v. Zarinsky, 75 N.J. 101, 106 (1977). "A statute of limitations balances the right of the public to have persons who commit criminal offenses charged, tried, and sanctioned with the right of the defendant to a prompt prosecution." Ibid. "It is designed to protect a defendant 'from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost.'" State v. Jones, 445 N.J. Super. 555, 566 (App. Div. 2016) (quoting Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 314 (1945)), aff'd, 233 N.J. 513 (2018).

D.

We now turn to the statute at issue in this case.  N.J.S.A. 2C:1-6 sets forth time limitations for the prosecution of various offenses.  Section (b)(1) of the statute provides that "[a] prosecution for a crime must be commenced within five years after it is committed."  N.J.S.A. 2C:1-6(b)(1).  Section (c) notes that the statute of limitations for most crimes begins "to run on the day after the offense is committed."  N.J.S.A. 2C:1-6(c).

The statute, however, carves out an exception for circumstances in which the prosecution includes DNA or fingerprint evidence.  Ibid.  In those cases, the statute provides that

> [t]ime starts to run on the day after the offense is committed, except that when the prosecution is supported by physical evidence that identifies the actor by means of DNA testing or fingerprint analysis, <u>time does not start to run until the State is in possession of both the physical evidence and the DNA or fingerprint evidence necessary to establish the identification of the actor by means of comparison to the physical evidence</u>.
>
> [Ibid. (emphasis added).]

The Court has previously considered the meaning of the phrase "identifies the actor" within N.J.S.A. 2C:1-6(c).  In Twiggs, the Court addressed in a consolidated opinion two cases in which DNA evidence of a third party was used to identify the defendant.  233 N.J. at 523-28.  The Twiggs Court had to determine whether N.J.S.A. 2C:1-6(c)'s tolling

22

"provision applies when a DNA identification does not directly identify the defendant but rather begins an investigative chain that leads to the defendant." Id. at 520. "Based on the plain language of N.J.S.A. 2C:1-6(c) and the policy rationale underlying the criminal statute of limitations, [the Court concluded] that the DNA-tolling exception applies only when the State obtains DNA evidence that directly matches the defendant to physical evidence of a crime." Id. at 521. Although that determination is not relevant to the circumstances of this case, the Court's reliance on the statute's policy rationale and its narrow construction of the statute's plain language are informative. And, in interpreting the plain language, the Court determined the meanings of the words "actor" and "identifies" -- neither of which were defined in in N.J.S.A. 2C:1-6(c) -- according to the dictionary meanings of the words. Id. at 535.

In this case, the key terms are "possession," "necessary," "establish," and "comparison," and the Legislature did not include those terms in the definition section of the Code. See N.J.S.A. 2C:1-14(a) to (r). Therefore, we are required to ascribe the "generally accepted meaning" of the words, Carter, 247 N.J. at 513 (quoting N.J.S.A. 1:1-1), and must "read them in context with related provisions so as to give sense to the legislation as a whole," DiProspero, 183 N.J. at 492.

23

The word "possession" commonly connotes "the act of or fact of possessing" with "possess" meaning "to gain or seize." Merriam-Webster's II New College Dictionary 882 (3d ed. 2005). The word "necessary" in this context means "absolutely required," or "needed for some purpose or reason; essential." Id. at 748; see also Black's Law Dictionary 1241 (11th ed. 2019).

"Establish" in this context means "to prove the truth of." Merriam-Webster's II New College Dictionary 392 (3d ed. 2005). Finally, "comparison" refers in relevant part to "the act of comparing" in order to "examine so as to note similarities or differences." Id. at 234.

V.

Applying the customary principles of statutory construction, we hold that a plain reading of N.J.S.A. 2C:1-6(c) requires the statute of limitations in cases involving DNA evidence to begin when the State possesses the physical evidence from the crime as well as the DNA sample from the defendant, not when a match is confirmed.

As noted, N.J.S.A. 2C:1-6(c) is an exception to the general rule found in N.J.S.A. 2C:1-6(b)(1) that a prosecution "must be commenced within five years after [the crime] is committed." The exception in N.J.S.A. 2C:1-6(c) provides that "time does not start to run until the State is in possession of both the physical evidence and the DNA or fingerprint evidence necessary to

24

establish the identification of the actor by means of comparison to the physical evidence."

A plain reading of the statute reveals that the statute of limitations, in cases involving DNA evidence, begins to run when "the State is in possession of" two things: (1) the physical evidence from the crime and (2) the DNA of the suspect. Those are the two items "necessary to establish the identification of the actor by means of comparison of the physical evidence." N.J.S.A. 2C:1-6(c). Stated differently, once the State is in possession of the two pieces of information, those two DNA samples can be compared to determine whether the suspect's DNA matches the DNA evidence recovered from the crime scene.

The plain language of the statute unequivocally states that the time does not begin "until the State is in possession of <u>both</u>" those items. This is a logical point at which to begin the statute of limitations clock because the expectation is that once law enforcement possesses the DNA from the crime and a suspect's DNA, those samples will be compared to determine whether there is a match. It is unlikely that the Legislature contemplated a situation in which the State would possess both items necessary to generate a match but that the DNA match would not occur given the systems in place to coordinate, maintain, and compare DNA samples both locally and nationally.

25

Indeed, the DNA Database and Databank Act of 1994, N.J.S.A. 53:1-20.17 to -20.38, contemplates the procedures by which DNA evidence is collected and maintained by the State Lab and forwarded to the FBI for inclusion into the CODIS database. The Lab sends DNA profiles to CODIS for the storage, exchange, and comparison of DNA records contributed by federal, state, and local labs from around the country with the expectation that DNA matches and hits will occur upon inputting DNA profiles into those systems. See id. at 53:1-20.19 to -21, -24. Any other reading would permit the State to be in possession of physical evidence from a crime scene and DNA evidence from a suspect and yet allow that evidence to go untested for an inordinate amount of time, thereby tolling the statute of limitations. That was certainly not the Legislature's expectation when it created the carve out to the five-year statute of limitations for cases involving DNA evidence.

The State argues that a logical reading of N.J.S.A. 2C:1-6(c) directs that the statute of limitations begins to run when the State is in possession of a match of the crime scene evidence and the suspect's DNA. The State further contends that the phrase "necessary to establish the identification" indicates

26

that the match is required in order to trigger the statute of limitations.[9]  The

State's interpretation of the statute's plain language, however, is irreconcilable

with the entirety of the provision.  As previously discussed, this portion of the

statute essentially states that the clock begins to run when the State is in

possession of the two items needed to generate a match, i.e., identification of

an actor by means of comparison.  Were we to adopt the State's reading of the

statute and substitute the word "match" for the terms "physical evidence and

DNA," then the statute would prescribe that the statute of limitations begins

when the State is in possession of a <u>match</u> necessary to generate a <u>match</u>.  That

reading leads to an illogical interpretation of the statute and renders the second

half of that clause superfluous.  If the Legislature did in fact contemplate that a

match would trigger the start of the statute of limitations, it undoubtedly could

have easily said so.

Furthermore, the State's suggestion -- that the matching of the DNA

starts the statute of limitations -- completely ignores the language that states

---

[9]  The State additionally argues, and the Appellate Division held, that the statute of limitations in this case began to run either when the State received defendant's confirmatory sample or when the State had a conclusive match, or hit, utilizing that confirmatory sample.  To hold that the statute of limitations begins to run on either of the dates involving the "confirmatory sample," which is not mentioned anywhere in N.J.S.A. 2C:1-6(c), would add language to the statute that does not comport with the apparent Legislative intent found in the statute's plain language.

the time does not begin "until the State is in possession of both the physical evidence and the DNA."  In using the term "both," the Legislature signaled that the two items that follow the term are the items the State must be in possession of in order to start the clock.

In sum, a plain reading of the statute leads to the conclusion that the statute of limitations begins to run exactly as the statute directs -- when the State possesses both the physical evidence from the crime and a suspect's DNA sample -- not when a match occurs.  That reading appropriately construes narrowly the exception to the five-year limitations period.  See P.A.F., 176 at 223.  And a contrary reading would essentially endorse inaction by a prosecution equipped with all the necessary components to identify a suspect, a reading that cannot be reconciled with the protective purpose of a statute of limitations.  See Twiggs, 233 N.J. at 539; Diorio, 216 N.J. at 612.

## VI.

Having determined that the statute of limitations pursuant to N.J.S.A. 2C:1-6(c) begins to run when the State is in possession of the two items necessary to generate a match, we must now determine when the clock started in this case.

To be sure, this is an unusual case.  Here, the physical evidence from the crime, Specimen 12A, was collected on July 22, 2001, a day after the crime.  It

28

was sent to the Lab on July 26, 2001, and entered into CODIS sometime in 2002. Due to an unwritten policy at the Lab based on its understanding that exclusionary data should not be reported, not all facets of Specimen 12A's DNA profile were entered into CODIS. As a result, the DNA profile for Specimen 12A that was entered into CODIS could never have generated a match because the profile did not include sufficient information to properly compare it to another DNA profile. So after defendant's DNA was collected in January 2004 and his DNA profile was entered into CODIS in April 2006, that entry did not result in a match with the profile entered in 2002.

At some point in 2010, the FBI updated the NDIS manual to reflect that the exclusionary data -- loci with peaks under 100 RFUs, the same data that the Lab did not enter for Specimen 12A -- could be entered into the system. The Lab, however, did not change its procedures to reflect the 2010 update in the NDIS manual until 2016. In 2016, upon entering the exclusionary data for Specimen 12A, the Lab was alerted that a match occurred between defendant's DNA and another sample.

In this case, the State Lab possessed both the physical evidence from the crime and defendant's DNA sample as of January 29, 2004. At the time, however, the Lab's understanding of the NDIS policies and procedures that state laboratories must follow in order to continue participation in the database

29

resulted in a policy by which the Lab did not include all data present in a DNA sample, i.e., loci with peak heights below 100 RFUs. From the Lab's perspective, such exclusionary data that fell below the Lab's analytical threshold was not to be used for data interpretation or analysis and was therefore left off DNA profiles. The Lab believed this was in line with the NDIS procedures.

Although we hold that N.J.S.A. 2C:1-6(c) requires the statute of limitations to begin when the State is in possession of the physical evidence and the DNA sample, there may be situations in which the science or the generally accepted scientific guidance at the moment those items come into the State's possession has not advanced so far as to allow for that evidence to actually generate a match. Indeed, if the State possessed a sample but the technology had yet to evolve to allow a usable DNA profile to be created from that evidence, it would not be the case that the State was then in possession of the evidence "necessary to establish the identification of the actor by means of comparison of the physical evidence." If the science has yet to be developed or if the method of analysis that would lead to a match has not been officially adopted within the scientific community, then regardless of whether the State possesses the evidence, the statute of limitations does not start to run.

30

Here, there was a lack of clarity at the Lab, and perhaps the scientific community at large regarding the utility of including exclusionary data below a certain threshold within DNA profiles. At the time the Lab entered Specimen 12A, the Lab did not include that data because it was under the impression that it could not do so pursuant to NDIS guidelines and that the data was inconclusive.

In 2010, however, the FBI updated the NDIS manual to specifically note that peaks below 100 RFUs could be added to the DNA profile. So as of 2010, the State Lab was in possession of Specimen 12A, defendant's DNA, and updated guidance from NDIS officially adopting a policy that allowed for the subject exclusionary data to be entered for Specimen 12A. Thus, even if the scientific guidance was unclear in 2004, there was no uncertainty regarding the use of exclusionary data with the update to the NDIS manual by 2010. Once NDIS manual gave the go-ahead for including the exact information in a DNA profile that the Lab previously excluded, the Lab was on notice and effectively had all the evidence it needed as well as the scientific capability and guidance to generate a match. Consequently, we hold that the statute of limitations in this case began to run in 2010, when the FBI updated the NDIS manual.

31

Given that the statute of limitations began to run in 2010, defendant's 2017 indictment was well beyond the five-year limitations period.[10]

## VII.

For the foregoing reasons, we reverse the judgment of the Appellate Division and remand the matter for defendant's convictions to be vacated. The charges arising from the 2001 assault on C.S. are time-barred.

CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion. JUDGE FUENTES (temporarily assigned) did not participate.

---

[10] In his petition for certification, defendant also challenged the Appellate Division's affirmance of his sentence. Because defendant's convictions must be vacated on statute of limitations grounds, we do not reach the sentencing issues raised in his petition.